**No. 23-374**
——————————————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**MARTIN VERA-RIVAS,**

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Cathy A. Bencivengo, Presiding,
No. 19-CR-3622-JLB-CAB

———

**APPELLANT'S OPENING BRIEF**
——————————————————————

KATIE HURRELBRINK
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ........................................................................................... 1

STATEMENT OF JURISDICTION ..................................................................... 2

BAIL STATUS ............................................................................................... 3

RELEVANT LEGAL PROVISIONS ................................................................... 3

ISSUES PRESENTED .................................................................................... 4

STATEMENT OF THE CASE ........................................................................... 5

    I.   The arresting agent had no memory of Mr. Vera-Rivas or his arrest, but he identified Mr. Vera-Rivas based on a different, non-testifying agent's labeled photograph. ............... 5

        A.   The arresting agent read his report into the record under the "recorded recollection" hearsay exception, but the photographs at the bottom of his report were too blurry to see. .................................. 5

        B.   The prosecutor produced a free-floating photograph of Mr. Vera-Rivas, which a different agent had allegedly taken after the arrest. .................. 8

        C.   This unidentified photographing agent labeled the photo, and the arresting agent conveyed those labels to link the photo to the arrest. ......................... 10

    II.  The magistrate judge rejected Mr. Vera-Rivas's corpus delicti defense. ......................................................... 11

        A.   The arresting agent admitted that Mr. Vera-Rivas was arrested in a "recreation[al]" area, and the only other witness—the interrogating agent—testified solely to Mr. Vera-Rivas's post-arrest statements. ................................................. 11

i

B.    Defense counsel urged acquittal under the corpus delicti doctrine because (1) the court should have excluded the photo and discounted the arresting agent's observations, and (2) even the arresting agent's observations were insufficiently corroborative. ............................................. 12

C.    The magistrate judge found Mr. Vera-Rivas guilty, relying on the arresting agent's observations, his opinion that the arrest area was a known smuggling route, and his reaction to a radio operator's hearsay statements. ........................... 14

SUMMARY OF ARGUMENT .......................................................... 15

STANDARDS OF REVIEW ............................................................ 17

ARGUMENT .............................................................................. 18

I.    The freestanding photo was inadmissible, and its erroneous admission prejudiced Mr. Vera-Rivas by forging a link between him and the arresting agent's observations. ............................................. 19

A.    The government laid the foundation for the freestanding photo using the photographing agent's inadmissible hearsay statements ................... 19

B.    The error was prejudicial because the government used the photo to link the arresting agent's observations to the person on trial for illegal entry. ................................................ 27

II.    The magistrate judge made evidentiary errors in assessing the arresting agent's testimony, and with or without the erroneous findings, his testimony did not sufficiently corroborate Mr. Vera-Rivas's alienage. ................. 29

A.    The magistrate judge made several errors in evaluating the arresting agent's testimony ................ 31

       i.     The magistrate judge derived "hidden hearsay" from the agent's reaction to a radio communication. .................................................... 31

       ii.    The magistrate judge speculated without evidence that the arresting agent saw the soon-to-be arrestees running *toward* him. ......... 33

    B.    The arresting agent's testimony was insufficient to satisfy corpus delicti, because Mr. Vera-Rivas was found in a recreational area and no other circumstances suggested that he was a non-citizen. ...................................................... 34

 III.  The magistrate judge admitted improper opinion testimony about the Zullners area. ......................................... 42

CONCLUSION ................................................................ 46

iii

## TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Huddleston v. United States,*
485 U.S. 681 (1988)................................................................26

*Juan H. v. Allen,*
408 F.3d 1262 (9th Cir. 2005)................................................34

*Lin v. Gonzales,*
434 F.3d 1158 (9th Cir. 2006)................................................34

*Neely v. St. Paul Fire & Marine Ins. Co.,*
584 F.2d 341 (9th Cir. 1978)................................................34

*United States v. Abou-Saada,*
785 F.2d 1 (1st Cir. 1986) ....................................................20

*United States v. Cristerna-Gonzalez,*
962 F.3d 1253 (10th Cir. 2020)............................................44

*United States v. Fearn,*
589 F.2d 1316 (7th Cir. 1978)................................................39

*United States v. Gadson,*
763 F.3d 1189 (9th Cir. 2014)................................................29

*United States v. Galindo-Gallegos,*
244 F.3d 728 (9th Cir. 2001)...................................35, 38, 42

*United States v. Garcia-Villegas,*
575 F.3d 949 (9th Cir. 2009)............................................36, 38

*United States v. Gonzalez-Corn,*
807 F.3d 989 (9th Cir. 2015)................................................38

*United States v. Hernandez,*
    105 F.3d 1330 (9th Cir. 1997)........................................................35

*United States v. Juhic,*
    954 F.3d 1084 (8th Cir. 2020)..............................................21, 23

*United States v. Katakis,*
    800 F.3d 1017 (9th Cir. 2015)..............................................33, 34

*United States v. Lague,*
    971 F.3d 1032 (9th Cir. 2020)........................................................45

*United States v. Lizarraga-Tirado,*
    789 F.3d 1107 (9th Cir. 2015)..............................................20, 25

*United States v. Lopez,*
    762 F.3d 852 (9th Cir. 2014)................................................17, 18

*United States v. Lopez-Alvarez,*
    970 F.2d 583 (9th Cir. 1992)...............................29, 30, 39, 41

*United States v. Meises,*
    645 F.3d 5 (1st Cir. 2011) ............................................................32

*United States v. Morales,*
    720 F.3d 1194 (9th Cir. 2013)......................................................25

*United States v. Navarrette-Aguilar,*
    813 F.3d 785 (9th Cir. 2015)........................................................34

*United States v. Pena-Gutierrez,*
    222 F.3d 1080 (9th Cir. 2000)......................................................17

*United States v. Ramirez-Cortez,*
    213 F.3d 1149 (9th Cir. 2000)......................................................35

*United States v. Reed,*
    575 F.3d 900 (9th Cir. 2009)........................................................44

*United States v. Rodriguez-Soriano,*
  931 F.3d 281 (4th Cir. 2019)............................................................40

*United States v. Ruiz-Lopez,*
  749 F.3d 1138 (9th Cir. 2014)..........................................................35

*United States v. Sandoval-Gonzalez,*
  642 F.3d 717 (9th Cir. 2011)............................................................37

*United States v. Sotelo,*
  109 F.3d 1446 (9th Cir. 1997)..........................................................36

*United States v. Stephens,*
  482 F.3d 669 (4th Cir. 2007)............................................................40

*United States v. Tanco-Baez,*
  942 F.3d 7 (1st Cir. 2019) ...............................................................40

*United States v. Torres,*
  794 F.3d 1053 (9th Cir. 2015)..........................................................20

*United States v. Valdez-Novoa,*
  780 F.3d 906 (9th Cir. 2015)............................................................18

*United States v. Valencia-Lopez,*
  971 F.3d 891 (9th Cir. 2020)............................................................18

*United States v. Valentine,*
  539 F.3d 88 (2d Cir. 2008) ..............................................................41

*United States v. Wallen,*
  842 Fed. Appx. 76 (9th Cir. 2021) ...................................................18

*United States v. Wasylyshyn,*
  979 F.3d 165 (2d Cir. 2020) .............................................................18

*United States v. Williams,*
  827 F.3d 1134 (D.C. Cir. 2016)........................................................44

vi

*United States v. Wong Sun,*
  371 U.S. 471 (1963) ........................................................ 13, 29

**Statutes**                                                  **Page(s)**

8 U.S.C. § 1401 ........................................................ 41

8 U.S.C. § 1403 ........................................................ 41

8 U.S.C. § 1409 ........................................................ 41

8 U.S.C. § 1431 ........................................................ 41

8 U.S.C. § 1432 ........................................................ 41

18 U.S.C. § 1325 .............................................. 5, 30, 35

18 U.S.C. § 3231 ........................................................ 2

18 U.S.C. § 3401 ........................................................ 2

18 U.S.C. § 3402 ........................................................ 3

28 U.S.C. § 41 ........................................................ 3

28 U.S.C. § 84 ........................................................ 3

28 U.S.C. § 1291 ........................................................ 3

28 U.S.C. § 1294 ........................................................ 3

Fed. R. App. P. 4 ........................................................ 3

Fed. R. Crim. P. 16 .................................................. 44

Fed. R. Crim. P. 29 .................................................. 12

Fed. R. Crim. P. 58 .................................................. 18

Fed. R. Evid. 401 ...............................................................24

Fed. R. Evid. 701 ......................................................42, 43

Fed. R. Evid. 702 ................................................42, 43, 45

Fed. R. Evid. 801 ...............................................................20

Fed. R. Evid. 803 .......................................................6, 25, 26

Fed. R. Evid. 901 ......................................................23, 26

## Other Authorities              Page(s)

Black's Law Dictionary (10th ed. 2014) ...............................29

Charles Alan Wright & Arthur R. Miller, 21A Fed. Prac. & Proc. Evid. § 5055 (2d ed.) ....................................................26

Christopher B. Mueller & Laird C. Kirkpatrick, 4 Federal Evidence §§ 8:8–8:9 (4th ed.) .........................................20

David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L.J. 817, 829–31 (2003) ..................................................1

Jacqueline Stevens, *U.S. Government Unlawfully Detaining and Deporting U.S. Citizens As Aliens*, 18 Va. J. Soc. Pol'y & L. 606 (2011) ...............................................................42

### INTRODUCTION

Martin Vera-Rivas's misdemeanor illegal entry trial revolved around a doctrine deeply rooted in the American legal tradition: corpus delicti. *See generally* David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L.J. 817, 829–31 (2003). That doctrine guards against the dangers of coercive or unreliable confessions by prohibiting the government from obtaining convictions based on a defendant's statements alone. Instead, the government must corroborate the essential elements of an offense with independent evidence.

Corpus delicti played a central role in this case. During and after his arrest, Mr. Vera-Rivas stated that he was not a U.S. citizen, the key "alienage" element of an illegal entry offense. Normally, the government readily corroborates such statements, using documents from immigration agencies or evidence about how the defendant entered.

But not here. Instead, the government's corroboration hinged entirely on the arresting border patrol agent's testimony. That testimony was unusually weak. The border patrol agent had no memory of Mr. Vera-Rivas or his arrest. He had to testify based on his cursory, post-arrest report. That report documented little more than a few details about the arrest area. But as the agent admitted, Mr. Vera-Rivas was arrested in a "recreation[al]" spot, populated with wineries, campsites, and ATV parks—an area frequented by U.S. citizens.

1

Worse yet, though the report included pictures of the arrestees, the pictures were so blurry that the agent could not see them. He therefore could not even testify from the report that Mr. Vera-Rivas was the person he arrested. To sidestep this difficulty, the prosecutor produced a free-standing photo of Mr. Vera-Rivas—a photo not attached to any report—and prompted the agent to say that that photo depicted the man he arrested. Defense counsel strenuously objected. In the ensuing back-and-forth, it become clear that a different, non-testifying agent had taken the photograph at the border patrol station, then labeled it with Mr. Vera-Rivas's name and a code linking him to the arrest. Over hearsay objections, the arresting agent testified about those labels, which laid the foundation to admit the photo and identify Mr. Vera-Rivas as the person arrested that day.

That error prejudiced Mr. Vera-Rivas's corpus delicti defense, warranting at least a new trial. But even accounting for the arresting agent's observations, this Court has never accepted so little corroboration to satisfy corpus delicti. Thus, this Court should reverse Mr. Vera-Rivas's conviction for insufficient evidence.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction over this case under 18 U.S.C. § 3231. The magistrate judge had jurisdiction to try Mr. Vera-Rivas under 18 U.S.C. § 3401, and the district court had jurisdiction

over an appeal from the magistrate judge's judgment under 18 U.S.C.
§ 3402. This Court has jurisdiction over a timely appeal from a final
order entered in the Southern District of California, which is within this
Court's geographical jurisdiction. *See* 28 U.S.C. §§ 41, 84(d) 1291,
1294(1). The district court entered an order affirming the magistrate
judge's judgement on March 7, 2023. ER-3–8.[1] Mr. Vera-Rivas timely
filed a notice of appeal two days later *See* ER-122; Fed. R. App. P.
4(b)(1).

## BAIL STATUS

Mr. Vera-Rivas received a time-served sentence and is therefore
no longer in custody. ER-93.

## RELEVANT LEGAL PROVISIONS

**Federal Rule of Evidence 801** includes the following relevant
definitions:

> *(a) Statement.* "Statement" means a person's oral assertion,
> written assertion, or nonverbal conduct, if the person intended it
> as an assertion.
>
> . . .
>
> *(c) Hearsay.* "Hearsay" means a statement that:
>
>> *(1)* the declarant does not make while testifying at the
>> current trial or hearing; and

---

[1] In this brief, "ER" stands for "Appellant's Excerpts of Record" and
"Doc." stands for "district court docket number."

*(2)* a party offers in evidence to prove the truth of the matter asserted in the statement.

**Federal Rule of Evidence 802** provides, "Hearsay is not admissible unless [federal statutes or rules] provides otherwise[.]"

**Federal Rule of Evidence 701** states,

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

> *(a)* rationally based on the witness's perception;

> *(b)* helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

> *(c)* not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

**Federal Rule of Evidence 702** says,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> *(a)* the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> *(b)* the testimony is based on sufficient facts or data;

> *(c)* the testimony is the product of reliable principles and methods; and

> *(d)* the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

## ISSUES PRESENTED

I.  Did the magistrate judge reversibly err in admitting the freestanding photo?

4

II.   Did the magistrate judge reversibly err in assessing the corroborating evidence and finding that it satisfied corpus delicti?

III.  Did the magistrate judge reversibly err in admitting as lay opinion that Zullners was a known route for illegal immigration?

### STATEMENT OF THE CASE

## I.   The arresting agent had no memory of Mr. Vera-Rivas or his arrest, but he identified Mr. Vera-Rivas based on a different, non-testifying agent's labeled photograph.

On September 19, 2019, Martin Vera-Rivas was charged by information with misdemeanor illegal entry. 18 U.S.C. § 1325(a)(1); ER-121. He pled not guilty and elected to go to trial. *See* ER-9. A bench trial before a magistrate judge took place the following December. ER-9.

### A.   The arresting agent read his report into the record under the "recorded recollection" hearsay exception, but the photographs at the bottom of his report were too blurry to see.

At trial, the government called two witnesses, both border patrol agents. The first to testify was the agent who allegedly arrested Mr. Vera-Rivas in the field ("the arresting agent").

The arresting agent began his testimony by describing his qualifications. He related that he was a U.S. border patrol agent, employed in that role for about ten years. ER-15. He was currently stationed at the El Cajon Border Patrol Station. ER-16. Asked for his typical duties, he responded only, "I'm a canine handler." ER-16.

5

He then turned to discussing an arrest that occurred on May 15, 2019. ER-16. At the outset, he admitted that he had a memory problem: He did not recognize Mr. Vera-Rivas or have an "independent recollection" of arresting him. ER-17. He had tried to jog his memory by looking at his arrest report, but he had failed. ER-17. He therefore proposed to testify by reading his report into the record, per the "recorded recollection" hearsay exception. Fed. R. Evid. 803(5); ER-17–18. The magistrate judge agreed, with the caveat that the report itself would not be received into evidence. ER-19–20; *see also* Fed. R. Evid. 803(5) (providing that the proponent may ask for the record to be "read into evidence" but not that it be "received as an exhibit").

The arrest report began by describing a radio call from San Diego Sector Communications: On May 15, 2019, radio operators had alerted their patrolling colleagues that something had activated a seismic intrusion device in an area known as "Zullners." ER-21. Zullners, the report asserted, "is known to be a commonly used route of travel for illegal aliens to further their entry into the United States." ER-23.

Defense counsel interposed two objections. First, she objected that the radio call was inadmissible hearsay. ER-21. The magistrate judge agreed and received that testimony only "for the limited purpose of effect on the listener, not for the truth of the matter asserted." ER-23.

6

Second, she objected that the characterization of Zullners was "improper opinion testimony." ER-23. The prosecutor agreed, admitting, "Counsel is right." ER-23. But the magistrate judge thought otherwise: "Do you want to rethink? That objection is overruled." ER-23–24.

The agent continued reading the report. It recounted that the arresting agent had responded to "an area on state route 94 directly north of [Zullners]," about 250 yards north of the border and several miles away from the Tecate port of entry. ER-24. "While driving in this area," the report said, the agent had "observed five subjects jumping from the brush onto state route 94 and start running the highway east [sic]." ER-24. Per the report, the agent got out of his vehicle, approached the group, and questioned them about their immigration status. ER-24. He then arrested them and arranged for their transport to the border patrol station. ER-26.

Several photographs appeared at the bottom of the report. ER-26. The report said that the agent would initial the photos to "indicate that these photographs depict the individuals that [he] encountered and arrested on May 15, 2019." ER-96. (In fact, he did not initial any of the

photos. ER-96.) The photos, still not admitted into evidence, looked like this, ER-96:



### B. The prosecutor produced a free-floating photograph of Mr. Vera-Rivas, which a different agent had allegedly taken after the arrest.

There was a problem with the photographs in the report: They were too blurry to see. ER-96. As the prosecutor put it, "These are pretty bad photos[.] . . . It looks like a copy of a copy of a copy of a copy." ER-28. Thus, based on the report alone, the arresting agent could not testify that any of the pictures attached to the report depicted the person in the courtroom. *See* ER-28.

8

The prosecutor then asked the arresting agent to "turn to Exhibit 1." ER-28. Exhibit 1 was a freestanding photograph, not attached to any report. ER-97. It looked like this, ER-97:



"Do you see Exhibit 1?" the prosecutor asked. ER-28. "Yes," the agent replied. ER-29. "What is it?" the prosecutor asked. ER-29. The agent responded, "It's a picture of the subject," i.e., the man on trial, Mr. Vera-Rivas. ER-29. The agent then asserted that the freestanding photograph was the same as one of the photos at the bottom of his arrest report. ER-29.

Defense counsel objected. She pointed out that, per the arresting agent's testimony, he could not see the photos in the report or remember the people whom he arrested that day. ER-29. How, then,

could he testify that this freestanding photograph looked like one of the arrestees depicted in his arrest report?

### C. This unidentified photographing agent labeled the photo, and the arresting agent conveyed those labels to link the photo to the arrest.

The prosecutor tried again to lay the foundation. Between his questions and defense counsel's cross-examination, the following facts emerged.

The arresting agent did not take the photograph; some other, unidentified border patrol agent did. ER-38. This "photographing agent" had loaded the photograph into a border patrol database (or so the arresting agent assumed, based on his familiarity with border patrol procedure). ER-30, 34–35. The photographing agent had then digitally labelled the photograph with two pieces of information: (1) a border-patrol-generated "event number" associated with the arrest, and (2) a name, Martin Vera-Rivas. ER-31–32, 35, 38. Anyone who wanted to see the photos could then search the database by event number and pull up the photograph with that label. ER-32, 35. According to the arresting agent, this was how he typically obtained photographs to go in his arrest reports. ER-35.

In preparation for trial, the prosecutor had realized that the photos were too blurry to see. *See* ER-38. The prosecutor had therefore asked the arresting agent to pull another copy from the database. ER-

10

38. To make sure that the arresting agent pulled the one he wanted, the prosecutor had given the agent the name of the person he wanted to convict: Martin Vera-Rivas. ER-38. The agent had then typed in the event number; found the photo labeled with that name; and delivered it to the prosecutor. ER-38. That is how the freestanding photograph became Exhibit 1. ER-38.

Defense counsel objected repeatedly. She argued that the agent's testimony violated the hearsay rule, as the government had not called the photographing agent, and she contended that the arresting agent had not otherwise laid a "foundation for relevance . . . to connect [the freestanding photo] to this case." ER-29, 36, 40–41. The magistrate judge overruled her objections and admitted the photo. ER-41.

## II. The magistrate judge rejected Mr. Vera-Rivas's corpus delicti defense.

### A. The arresting agent admitted that Mr. Vera-Rivas was arrested in a "recreation[al]" area, and the only other witness—the interrogating agent—testified solely to Mr. Vera-Rivas's post-arrest statements.

On cross-examination, defense counsel elicited further information about the arrest area from the arresting agent. In response to her questions, the agent acknowledged that the group was arrested on Highway 94. ER-41. Eastbound, the highway connected to an interstate, which linked San Diego with Arizona. ER-41–42. Westbound, it intersected with another highway that went to the port of entry. ER-42.

11

There were wineries "very close to the arrest site," along with a campground and an ATV park. ER-42–43. "People use that area for recreation," defense counsel summed up, and the agent agreed. ER-43.

After the court released the arresting agent, the government called one more witness: the agent who had interrogated Mr. Vera-Rivas back at the border patrol station. This "interrogating agent" made a courtroom identification of Mr. Vera-Rivas, confirming that the man in the courtroom was the same man he had interrogated. ER-48.

The prosecutor admitted a transcript of Mr. Vera-Rivas's post-arrest statement through the interrogating agent. ER-66. In the statement, Mr. Vera-Rivas admitted the elements of illegal entry. ER-102–104. He also noted that just before his arrest, his group had run toward the arresting agent's vehicle, mistaking it for the car that would take them further into the interior. ER-111–112.

**B. Defense counsel urged acquittal under the corpus delicti doctrine because (1) the court should have excluded the photo and discounted the arresting agent's observations, and (2) even the arresting agent's observations were insufficiently corroborative.**

When the interrogating agent finished testifying, both parties rested. ER-68–69

Defense counsel then asked for the magistrate judge to acquit Mr. Vera-Rivas, either for insufficient evidence, *see* Fed. R. Crim. P. 29,

or in her capacity as finder of fact. ER-69. Defense counsel contended that Mr. Vera-Rivas was legally innocent under the corpus delicti doctrine. ER-76. That doctrine provides that the government cannot convict a defendant using only their statements; external corroboration is required. *See United States v. Wong Sun*, 371 U.S. 471 (1963). Defense counsel gave two reasons why corpus delicti merited acquittal.

First, defense counsel reiterated her objections to admitting the freestanding photograph. ER-76. Defense counsel pointed out that the government had used the photograph to link the arrest report to Mr. Vera-Rivas, showing that the man arrested was the same man sitting in the courtroom on trial for illegal entry. ER-76. Excluding the photo—or according it no weight—would sever that link, and with it, the foundation for the arresting agent's testimony. ER-76. Without the arresting agent's observations, the only evidence left was Mr. Vera-Rivas's statements to the interrogating agent, evidence insufficient under corpus delicti. ER-76.

Second, defense counsel contended that even if the arresting agent's observations were admitted and accorded weight, they were still insufficient to corroborate Mr. Vera-Rivas's post-arrest admissions. ER-79–80.

13

### C. The magistrate judge found Mr. Vera-Rivas guilty, relying on the arresting agent's observations, his opinion that the arrest area was a known smuggling route, and his reaction to a radio operator's hearsay statement.

The magistrate judge rejected both defenses. She implicitly reaffirmed her ruling admitting the photograph and, with it, the arresting agent's observations. *See* ER-85. She then determined that the arresting agent's observations sufficiently corroborated the statements made during the interrogation. ER-85–88. In particular, she cited six corroborating factors from the arresting agent's report, all concerning the circumstances of Mr. Vera-Rivas's arrest:

First, the arrest site was close to the border. ER-85.

Second, the arrest site was far from a port of entry. ER-85.

Third, Mr. Vera-Rivas was hiding in the shrubs with four other individuals. ER-85–86.

Fourth, when the group emerged from the shrubs, they ran toward the border patrol vehicle, corroborating Mr. Vera-Rivas's account of the group's mistake. ER-86. Defense counsel objected that the agent did not say the group ran toward him—he said that the group was running "east," but not whether they ran toward or away from him. ER-86–87. But the magistrate judge claimed she could draw that "inference" anyway. ER-87.

14

Fifth, the arrest area was north of Zullners, and Zullners was a "known alien smuggling route." ER-87; *but see supra*, Section I.A (describing defense objections to this testimony).

Sixth, the agent went to the arrest site in "response to a communication from San Diego Sector Communications via agency radio." ER-88. The magistrate judge acknowledged that this statement was not admitted for its truth. *See supra*, Section I.A. But she nevertheless believed she could account for the fact that the agent "was responding to an alert or a communication." ER-88.

Based on these facts, the magistrate judge convicted Mr. Vera-Rivas and imposed a time-served sentence. ER-88, 93. Mr. Vera-Rivas then appealed his conviction to the district court. *See* ER-3. The district court affirmed. ER-3–8.

This appeal follows.

## SUMMARY OF ARGUMENT

In the course of rejecting Mr. Vera-Rivas's corpus delicti defense, the magistrate judge committed two categories of reversible error.

First, the magistrate judge erred by admitting the freestanding photo of Mr. Vera-Rivas, because the arresting agent laid the foundation for the photo only through inadmissible hearsay. A non-testifying agent took the photo and labeled it with two pieces of information: (1) Mr. Vera-Riva's name, and (2) an "event number,"

15

which indicated that the person photographed was arrested at a particular time and place. The arresting agent could show that the freestanding photo was a photo of the person he arrested only by testifying to those labels. Those labels were therefore out-of-court statements offered for the truth of the matter asserted, i.e., inadmissible hearsay.

Without the hearsay statements, the photo never would have been admitted. And without the photo, the arresting agent could not show that his observations related to the man sitting in the courtroom, Mr. Vera-Rivas. Accordingly, absent the error, his observations would not have been admissible or probative for corpus delicti purposes, and no evidence would corroborate Mr. Vera-Rivas's statements. The hearsay error therefore severely prejudiced Mr. Vera-Rivas's defense.

Second, even accounting for the arresting agent's statements, the government's corroboration failed to satisfy corpus delicti. As an initial matter, the magistrate judge made two errors in evaluating the corroboration. She inferred "hidden hearsay" from the radio communication, and she speculated about which way the arrestees were running.

But with or without this information, the government's corroboration was too weak. It consisted primarily of details about the arrest location. By the arresting agent's own admission, however,

16

Mr. Vera-Rivas was arrested in a recreational area frequented by U.S. citizens, meaning that his presence there did nothing to corroborate alienage. And the few remaining details from the arrest report either had no tendency to corroborate guilt (e.g., the agent responding to the radio call) or supported only generalized suspicion of wrongdoing (e.g., the group crouching the in the bushes).

Finally, the arresting agent should not have been allowed to testify that Zullners was a known smuggling route. The government did not show that that opinion was rationally based on the agent's own perceptions, as required for lay opinion. And he could not testify based on his professional experience as a whole, because the government did not qualify him as an expert or establish the Zullners testimony's reliability.

Thus, this Court must reverse Mr. Vera-Rivas's conviction under corpus delicti, or at least reverse and remand for a new trial.

## STANDARDS OF REVIEW

**1. *Rules of Evidence.*** This Court "review[s] de novo the [lower] court's interpretation of the Federal Rules of Evidence," *United States v. Lopez*, 762 F.3d 852, 859 (9th Cir. 2014), including "whether the [lower] court correctly construed the hearsay rule." *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1086 n.3 (9th Cir. 2000). "[B]ut once [the Court] determine[s] that the evidence does fall within the given rule,

17

[the Court] review[s] the district court's decision to admit it for abuse of discretion." *Lopez*, 762 F.3d at 859. A court abuses its discretion when it fails to "identif[y] the correct legal standard for decision of the issue before it," including when it does not make appropriate findings before admitting expert testimony. *United States v. Valencia-Lopez*, 971 F.3d 891, 897 (9th Cir. 2020).

**2. *Corpus delicti.*** This Court reviews de novo the sufficiency of corroborating evidence for purposes of the corpus delicti doctrine. *United States v. Valdez-Novoa*, 780 F.3d 906, 921 (9th Cir. 2015).

**3. *District court's order affirming conviction.*** "On appeal from a district court's order affirming a misdemeanor conviction, . . . an appellate court applies to the magistrate judge's decision the same standard used by the district court, but without any deference to the district court's conclusion." *United States v. Wallen*, 842 Fed. Appx. 76, 78 (9th Cir. 2021) (citing Fed. R. Crim. P. 58(g)(2)(D)); *see also United States v. Wasylyshyn*, 979 F.3d 165, 169 n.2 (2d Cir. 2020) ("The Court of Appeals . . . reviews the magistrate judge's ruling applying the same standard of review as used by the district court.").

## ARGUMENT

At trial, defense counsel gave two reasons why Mr. Vera-Rivas was not guilty under the corpus delicti doctrine. First, she contended that the freestanding photo should not have been admitted. ER-76.

Without it, the arresting agent's observations—the only source of corroboration—should have been excluded or at least accorded no weight. ER-76–77. Second, she urged that even taking the arresting agent's observations into account, they were still insufficiently corroborative to convict Mr. Vera-Rivas. ER-76–77.

The magistrate judge rejected both theories, admitting the photo and finding that the arresting agent's testimony sufficiently corroborative. ER-85–88. In so doing, she relied on improper opinion testimony. ER-23. Each of these rulings constituted reversible error. They are taken in turn below.

## I. The freestanding photo was inadmissible, and its erroneous admission prejudiced Mr. Vera-Rivas by forging a link between him and the arresting agent's observations.

First, the magistrate judge reversibly erred by admitting the freestanding photo. That's because it was admitted into evidence only through inadmissible hearsay, and its admission prejudiced Mr. Vera-Rivas's corpus delicti defense.

### A. The government laid the foundation for the freestanding photo using the photographing agent's inadmissible hearsay statements.

The government laid the foundation for the freestanding photo only by conveying hearsay statements—specifically, by conveying the digital labels that the photographing agent attached to the freestanding photo in the border patrol database.

19

Rule 801 defines "hearsay" as an out-of-court "statement" offered for the truth of the matter asserted. Fed. R. Evid. 801(c). The term "statement" is defined broadly, as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). This definition instructs courts to look beyond literal words (if any) to discern the message that the speaker intends to convey. *See, e.g.*, *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015) (applying this rule to questions). For instance, "drawing an X on a paper map and labeling it 'hidden treasure'" is a statement, because it is "an assertion by the person drawing the X that treasure can be found at that location." *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015). Likewise, a witness's nonverbal conduct in pointing to a suspect can be a statement, if it asserts that *this* is the person the police are looking for. *Cf. United States v. Abou-Saada*, 785 F.2d 1, 8 (1st Cir. 1986) (similar, when one co-conspirator pointed to another).

The same rule applies to numbers and codes. "When people use words or symbols as coded expressions to express or communicate ideas, they are statements for purposes of the hearsay doctrine." Christopher B. Mueller & Laird C. Kirkpatrick, 4 Federal Evidence § 8:9 (4th ed.).

That includes when a person inputs codes into a computer program, which a different user accesses later on. For instance, the

National Center for Missing and Exploited Children ("NCMEC")
maintains a database of computer files marked "child-notable" and
"series"—shorthand codes for child pornography. *United States v. Juhic*,
954 F.3d 1084, 1087 (8th Cir. 2020). Law enforcement can pull up the
NCMEC files with their labels and match them to files on a defendant's
computer. *Id.* at 1089. The rule against hearsay, however, prohibits
law-enforcement witnesses from conveying these matches to the jury.
*Id.* at 1089. That's because the NCMEC codes are "out-of-court
statements offered for the truth of the matter asserted: that the videos
and images were child pornography." *Id.*

 Here, after taking the photo, the photographing agent loaded it
into a border patrol database and marked it with two labels: a name
("Martin Vera-Rivas") and an event number. ER-28, 31–32, 38. Both
were statements, because the photographing agent intended both to
convey an assertion about the photo to any other border patrol agent
who accessed it. The name is the most obvious. It conveyed the
assertion, "This is a photo of Martin Vera-Rivas."

21

The event number also conveyed an assertion. As the arresting agent explained, each time border patrol makes an arrest, that arrest is assigned an "event number." ER-31–32. The event number corresponds to the apprehension of a particular group at a particular time and place by a particular set of agents. *See* ER-31–31. Thus, when the arresting agent drew up his report, he described an arrest that occurred around noon on May 15, 2019, on the side of Highway 94, then labeled that report with the unique event number highlighted below, ER-96:

Case 3:19-cr-03622-JLB-CAB    Document 55-1    Filed 12/05/22    PageID.254    Page 4 of 30

| File Number | Title: | Control Office |
|---|---|---|
| U.S. Department of Homeland Securi[...] | MEMORANDUM OF INVESTIGATION | vent No:ECJ19050000[...] |
| | Primary Subject: CASTANEDA-ACUNA HERIBERTO | SDC/ECJ |

Memorandum of Investigation
------------------------------
On May 15, 2019, at approximately 12:15 p.m., I, Border Patrol Agent (BPA) Joseph Wynglarz, was performing my assigned duties in the El Cajon Border Patrol Station's Area of Operations. At this

The photographing agent labeled the database photo with the same event number. *See* ER-31–32. In so doing, the photographing agent conveyed the message that this was the man associated with that "event," i.e., with the arrest that occurred around noon on May 15, 2019 on the side of Highway 94. ER-31–32.

This conclusion would be more intuitive if the photographing agent had used words rather than numbers. Imagine that the arresting agent walked up to the photographing agent and asked, "Do you remember the guy I arrested around noon on May 15, 2019 on the side of Highway 94? Do you have his photograph?" And suppose that the

photographing agent replied by handing over a photo and remarking, "Yes, this is the photo of the man you arrested that day." Alternatively, imagine that the arresting agent looked in his physical files and found the freestanding photo with an attached note from the photographing agent: "This is the man border patrol arrested around noon on May 15, 2019 on the side of Highway 94." In either case, the photographing agent's responses or notations would be undeniable hearsay.

The event number is no different. It simply reduces the same information to a coded number, which other border patrol agents can access at will. ER-28, 31–32. It is like the NCMEC's "child notable" notations on computer files. *Juhic*, 954 F.3d at 1087–89. Both make an assertion about electronic data by labeling it with a code, and both are hearsay if conveyed to the factfinder. *See id*.

Not only are the event number and name labels "statements" for hearsay purposes. The arresting agent also had to offer them for their truth in order to show that the freestanding photo was relevant, as well as to authenticate the photo as a picture of the man arrested that day.[2]

---

[2] "Authentication and identification represent a special aspect of relevancy." Fed. R. Evid. 901, Notes of Advisory Committee on Proposed Rules. That's because, in some cases, evidence is only relevant if authenticated in a particular way. "[A] telephone conversation may be irrelevant," for instance, "because the speaker is not identified," i.e., because it is not authenticated as a phone call involving a person related to the case. *Id*. Here, the photograph was relevant to the case only if authenticated as a photo of the person arrested that day. The remainder

ER-28–41. To show that the freestanding photo was relevant, the arresting agent had to convince the factfinder that it was identical to one of the photos on the bottom of the arrest report—that is, that this was a picture of one of the people he arrested. *See* ER-31–32 (magistrate judge asking witness, "[H]ow do you know you're accessing the same photograph [as the one in the report]?"). Otherwise, it would just be a random photo of Mr. Vera-Rivas, with no tendency to show that he was guilty of the offense.

But the arresting agent had no memory of what the report photos, or their corresponding arrestees, looked like. ER-16–17. He therefore had to rely on the photographing agent's labels—the name and event number—to know that these were the same photos. ER-31–32. And he could convince the factfinder that they were the same photos only by describing those labels: He had to tell the magistrate judge that the photographing agent had labeled the photo with the same event number attached to his report, as well as with the name that the prosecutor had provided. ER-31–32. Thus, he conveyed hearsay statements to the factfinder as a necessary precondition to admitting the photo.

Finally, no hearsay exception or exclusion applied. The business records exception never applies to "records of government agencies."

---

of this section will therefore use the term "relevance" to capture both ordinary Rule 401 relevance and authentication.

*United States v. Morales*, 720 F.3d 1194, 1201 (9th Cir. 2013). And the public records exception did not apply here because, among other reasons, "matter[s] observed by law-enforcement" are "not includ[ed]" in that exception's purview. Fed. R. Evid. 803(8)(A)(ii). Thus, the foundational testimony supporting the freestanding photograph was inadmissible hearsay.

The district court affirmed the magistrate judge's ruling, but it was mistaken. The court reasoned that there was no hearsay violation because a photo is not a "statement" in the meaning of the rule. ER-5. But that misunderstands the hearsay problem. It is not the photo itself, but the photo in tandem with the database labels that created the assertion. The difference can be analogized to the map example from *Lizarraga-Tirado*: Perhaps a map itself is not an assertion, but "drawing an X on [the] map and labeling it 'hidden treasure'" is. 789 F.3d at 1109. The map in tandem with the label asserts: hidden treasure can be found here. *Id*. So, too, a picture itself may not be an assertion, but labeling the picture with a name and an event number associated with an arrest is. Together, they assert: this is a photo of a man named Martin Vera-Rivas, whom border patrol arrested at a particular time and place.

The government took a different tack in district court. It contended that the hearsay statement was not needed to establish the

25

photo's relevance, as one could simply compare the black blob on the bottom of the arrest report to the clear photo from the database and conclude that they were similar in shape. Doc. 57 at 8. But that theory founders on the fact that the arrest report itself was never entered into evidence. It could not be, by the express terms of the "recorded recollection" exception in Rule 803(5). Fed. R. Evid. 803(5) ("If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party."). And only admissible evidence can be used to establish relevance and authentication. *See* Charles Alan Wright & Arthur R. Miller, *Exclusionary Rules in Rule 104 Determinations*, 21A Fed. Prac. & Proc. Evid. § 5055 (2d ed.) ("[O]nly admissible evidence can be used when the judge is deciding to submit the evidence to the [factfinder] under Rule 104(b)."); *Huddleston v. United States*, 485 U.S. 681, 689–90 (1988) (relevance governed by Rule 104(b)); Fed. R. Evid. 901, Notes of Advisory Committee on Proposed Rules (authentication "governed by . . . Rule 104(b)").

Thus, the magistrate judge erroneously admitted hearsay from the photographing agent, which resulted in the erroneous admission of the photo. That chain of rulings merits reversal.

26

**B.** **The error was prejudicial because the government used the photo to link the arresting agent's observations to the person on trial for illegal entry.**

Admitting the photo was, in turn, highly prejudicial to Mr. Vera-Rivas's corpus delicti defense. That's because it allowed the arresting agent to sidestep his memory problems and testify that the observations in his report were about *this* defendant, the man in the courtroom on trial for illegal entry. ER-29. The magistrate judge then used the arresting agent's observations as the sole source of corroboration defeating corpus delicti. ER-85–88.

As defense counsel explained, her defense would have been much stronger without the photograph. First, she would have argued that the information in the arrest report should be excluded altogether on relevance grounds. ER-76. The photo helped the government establish that the agent's observations were relevant to the case by proving that they related to *this* defendant—that he was among the arrestees described in the report. Excluding the photo would sever that link. ER-76.

Second, at a minimum, excluding the photo would have given defense counsel an additional argument in favor of reasonable doubt. ER-76. She would have contended that, without a photo or witness who remembered the arrest, the government had not proved beyond a

27

reasonable doubt that the man on trial was the man whose apprehension the arresting agent described. ER-76.

The district court thought that any error in admitting the photograph was harmless, but again, the court was mistaken. According to the court, it did not matter whether the arresting agent identified Mr. Vera-Rivas, because the interrogating agent was able to make an identification—to confirm that *this* was the man he interrogated. ER-6–7. But the district court's logic does not follow: *This* may be the man the interrogating agent questioned, but that does not mean that *this* is the man the arresting officer apprehended. And here, it really matters whether Mr. Vera-Rivas was involved in this particular apprehension. It was the arresting agent's specific observations surrounding the arrest that the magistrate judge relied upon to reject the corpus delicti defense. ER-85–88. Without admissible evidence linking the specific arrest to the defendant on trial, the corpus delicti defense would have prevailed.

Thus, the magistrate judge's evidentiary error was prejudicial. This Court should vacate the conviction and remand for a new trial.

28

**II.  The magistrate judge made evidentiary errors in assessing the arresting agent's testimony, and with or without the erroneous findings, his testimony did not sufficiently corroborate Mr. Vera-Rivas's alienage.**

Reversal is required for a second reason: Even with the arresting agent's testimony, the government did not put forward sufficient, independent evidence to satisfy the corpus delicti doctrine.

As the Supreme Court explained a half-century ago, "a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun*, 371 U.S. at 489. Known as the rule of "*corpus delicti*," or "body of the crime," this phrase requires prosecutors to present more than just an accused's confession to secure a conviction—they must present corroborating evidence. Black's Law Dictionary (10th ed. 2014). One reason for this corroboration rule is "the high incidence of false confessions and the resulting need to prevent errors in convictions based upon untrue confessions alone." *United States v. Lopez-Alvarez*, 970 F.2d 583, 589 (9th Cir. 1992). Another is to "preserve a robust criminal justice system premised on 'extrinsic evidence independently secured through skillful investigation,'" rather than one that relies heavily on confessions. *United States v. Gadson*, 763 F.3d 1189, 1218 (9th Cir. 2014) (quoting *Lopez-Alvarez*, 970 F.2d at 589 n.5).

To comply with this *corpus delicti* rule, the prosecutor must satisfy a two-pronged test. First, the prosecutor must introduce

29

"sufficient evidence to establish that the criminal conduct at the core of the offense has occurred." *Lopez-Alvarez*, 970 F.2d at 592. Second, the prosecutor must introduce evidence "tending to establish the trustworthiness of the admissions, unless that confession is, by virtue of special circumstances, inherently reliable." *Id.* "Only when both these prongs are satisfied" will the *corpus delicti* requirement be met. *Id.*

Over the last several decades, the issue of *corpus delicti* has frequently arisen in the context of immigration-related crimes such as illegal entry under § 1325 and illegal reentry under § 1326. In these cases, the defendant often admits that they are not a citizen of the United States, usually at the time of arrest or in a post-arrest interrogation at the border patrol station. This admission goes to the element of "alienage," which is critical because if a United States *citizen* were to enter the country at a non-designated place, the "criminal conduct at the core of the offense" has not occurred. *Lopez-Alvarez*, 970 F.2d at 592. Courts are then faced with the question of what kind of evidence suffices to corroborate that admission.

In this unusual case, the government's evidence fell short of the mark. That's because, first, the magistrate judge committed errors in assessing the allegedly corroborating evidence. And second, with or without those erroneous findings, Mr. Vera-Rivas's arrest in a

recreational area did not corroborate that he was a non-citizen. These points are taken in turn.

### A. The magistrate judge made several errors in evaluating the arresting agent's testimony.

As an initial matter, the magistrate judge made two mistakes in interpreting or utilizing the alleged corroboration.

### i. The magistrate judge derived "hidden hearsay" from the agent's reaction to a radio communication.

First, the magistrate judge relied for corroboration on the fact that the arresting agent went to the arrest site in "response to a communication from San Diego Sector Communications via agency radio." ER-88. The magistrate judge had earlier recognized that that communication, if taken for its truth, was inadmissible hearsay. ER-88. She had therefore admitted the evidence for the limited purpose of explaining the arresting agent's actions. ER-88. But when it came time to evaluate that evidence for corpus delicti purposes, she made a legal error. She reasoned that even without the communication's content, she could still deem incriminating that (1) San Diego Sector Communications radioed the arresting agent, and (2) that radio communication caused the arresting agent to find Mr. Vera-Rivas. ER-88. The implication is that San Diego Sector Communications must have said *something* to suggest that an unlawful crossing was occurring in that area, the same area where Mr. Vera-Rivas was found.

31

The magistrate judge's reasoning is a recognized "technique" for subverting the hearsay rule: A proponent offers "hidden hearsay" by "describing encounters between the witness and a third person and then adduc[ing] testimony by the witness describing 'what he did then,' where the obvious inference was that the third person must have told him something, and the real point of the testimony was to prove the 'something' that the third person must have said." Mueller & Kirkpatrick, *supra, Assertive behavior—Hidden statements (hearsay at one remove)*, 4 Federal Evidence § 8:8 (4th ed.). "Fortunately, . . . reviewing courts [see] through the ploy and condemn[] the tactic as violating the hearsay doctrine." *Id.*

For instance, in *United States v. Meises*, a law enforcement witness testified that he interviewed the defendants' partner in crime, and as a result of that interview, he arrested the defendants. 645 F.3d 5, 21 (1st Cir. 2011). The First Circuit readily concluded that that testimony contained implicit hearsay. "It ma[de] no difference that the government took care not to introduce [the partner's] 'actual statements,'" the First Circuit reasoned. *Id.* "[A] reasonable jury could only have understood [the law-enforcement witness] to have communicated that [the partner] had identified [the defendants] as participants in the drug deal." *Id.*

32

The magistrate judge employed the same impermissible reasoning when it came to the agent's response to the radio message. Without that implicit, inadmissible hearsay, the radio message did nothing to corroborate guilt.

> ### ii. The magistrate judge speculated without evidence that the arresting agent saw the soon-to-be arrestees running *toward* him.

Additionally, the magistrate judge purported to "infer" from the arresting agent's testimony that, when the agent first pulled up to the arrest area, Mr. Vera-Rivas's group ran *toward* him. ER-87. According to the magistrate judge, that corroborated Mr. Vera-Rivas's post-arrest statement that the group mistook the border patrol vehicle for the car that would transport them further into the interior. ER-86. But in actuality, the agent testified only that he observed the group "start running the highway east." ER-24. With no information about whether the agent himself was coming from the east or the west, there is no basis to infer that the group was running in the agent's direction. The magistrate judge simply assumed as much with no evidence.

That was not allowed. "[A] reasonable inference is one that is supported by a chain of logic, rather than mere speculation dressed up in the guise of evidence." *United States v. Katakis*, 800 F.3d 1017, 1024 (9th Cir. 2015). Accordingly, "[t]he [factfinder] is not permitted to speculate in choosing one of alternative possibilities, but is restricted to

reasonable inferences based upon facts." *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 346 (9th Cir. 1978). In other words, when the evidence supports two "equally likely" scenarios, "speculation cannot be used to fill in the blanks." *Lin v. Gonzales*, 434 F.3d 1158, 1165–66 (9th Cir. 2006).

Though the magistrate judge claimed to be "infer[ring]" rather than speculating, ER-87, the record does not bear this out. No "chain of logic" connects the evidence ("running the highway east," ER-24) to the inference (running toward the agent). *Katakis*, 800 F.3d at 1024. It is just as likely that the group was running in the opposite direction. Because the magistrate judge allowed "[s]peculation and conjecture" to "take the place of reasonable inferences and evidence," this Court should disregard the magistrate judge's finding. *Juan H. v. Allen*, 408 F.3d 1262, 1279 (9th Cir. 2005); *see, e.g.*, *United States v. Navarrette-Aguilar*, 813 F.3d 785, 796 (9th Cir. 2015) (finding evidence insufficient after rejecting speculative inferences); *Katakis*, 800 F.3d at 1025 (same).

**B.** **The arresting agent's testimony was insufficient to satisfy corpus delicti, because Mr. Vera-Rivas was found in a recreational area and no other circumstances suggested that he was a non-citizen.**

Especially without the findings listed in the previous section—but even with them—the corroborating facts listed by the magistrate judge were insufficient under the corpus delicti doctrine.

34

In most cases, prosecutors can readily satisfy corpus delicti's demands by corroborating alienage with documents from the defendant's "A-File." An A-File is "the official record for an individual recording all of that individual's contacts or encounters with Immigration Customs Enforcement, Citizenship and Immigration Services, Custom and Border Protection, and the Legacy INS." *United States v. Ruiz-Lopez*, 749 F.3d 1138, 1140 (9th Cir. 2014) (simplified). Those documents standing alone will often satisfy corpus delicti, as "[a] defendant's admissions that he is an alien, together with a deportation order, suffice to establish alienage." *United States v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001).

Accordingly, in most sufficiency-of-the-evidence challenges to § 1325 and § 1326 convictions, a deportation order or an associated A-file document will be the "strongest piece of evidence" confirming alienage. *United States v. Hernandez*, 105 F.3d 1330, 1333 (9th Cir. 1997). This Court nearly always relies on such documents when deeming alienage sufficiently corroborated. *See, e.g.*, *Ruiz-Lopez*, 749 F.3d at 1141–42 (relying on deportation and other documents in the defendant's agency file, as well as prior admissions); *United States v. Ramirez-Cortez*, 213 F.3d 1149, 1158 (9th Cir. 2000) (finding sufficient corroboration based on the defendant's prior deportation order, prior admissions of alienage, and the testimony of an INS agent); *Hernandez*,

35

105 F.3d at 1332–33 (relying on a deportation order, mode of entry, and previous admissions); *United States v. Sotelo*, 109 F.3d 1446, 1448-49 (9th Cir. 1997) (relying on prior deportation documents and admissions of alienage during that deportation).

*United States v. Garcia-Villegas* presented a rare case where the government decided not to rely on A-file documents. 575 F.3d 949, 951 (9th Cir. 2009). But in that case, the Court had before it compelling observational evidence confirming alienage. A law enforcement witness saw the defendant climb over two border fences to enter the United States. *Id*. Then, a second officer found him on the other side with torn clothes and bloody hands. *Id*. This "mode of entry evidence" allowed a reasonable factfinder to conclude that the defendant was "conscious that he had no legal right to enter the United States." *Id*. Because that corroborating information "c[ame] not only from the defendant but also from two independent sources," it was "sufficient to provide the corroboration" corpus delicti requires. *Id*.; *see also United States v. Hernandez*, 105 F.3d 1330, 1333 (9th Cir. 1997) (relying partially on "mode of entry").

Here, the magistrate judge could not rely on either form of evidence. The government put forward no deportation order, A-file evidence, or other documentary evidence establishing alienage. And the government offered no observations relating to mode of entry. Instead,

36

the magistrate judge was reduced to relying on facts about the arrest area and circumstances. ER-85–88.

This Court has never accepted so little corroboration as the magistrate judge cited here. Setting aside the improper findings described *supra*, Section II.A, the magistrate judge relied on just four factors: that the group was arrested (1) close the border, (2) far from a port of entry, and (3) north of a common route for illegal immigration, and (4) the group was crouched in bushes. ER-85–86. The improper findings, if accounted for, add two more considerations: (5) The agent found the group in response to a radio communication, ER-86, and (6) the group ran toward the border patrol agent's car. ER-86–88.[3]

In the unusual circumstances of this case, the first two pieces of evidence (factors (1) and (2)) were especially weak. Oftentimes, immigrants are apprehended in remote areas, where people seldom go

_____

[3] The district court added a seventh factor, that Mr. Vera-Rivas "had no documents authorizing his presence in the United States." ER-8. There are four problems with that observation. One, it was not relied upon by the magistrate judge. ER-85–88. Two, it has no basis in the record. The arresting agent did not testify to cataloging what the arrestees had on them at the time of arrest. Three, it does nothing to establish alienage. Ordinary U.S. citizens do not go around with documents proving that they are lawfully present in the U.S., either. And four, it is burden shifting. It was the government that had to prove Mr. Vera-Rivas was a non-citizen. *United States v. Sandoval-Gonzalez*, 642 F.3d 717, 724 (9th Cir. 2011). The absence of evidence *dis*proving alienage is neither here nor there.

unless they are crossing the border. *E.g.*, *Galindo-Gallegos*, 244 F.3d at 730. But Mr. Vera-Rivas was arrested in a "recreation[al]" area, populated with wineries, campgrounds, and ATV parks. ER-43. Unlike hopping a border fence, merely being in a recreational area does not suggest a "conscious[ness] that [one] ha[s] no legal right to enter the United States." *Garcia-Villegas*, 575 F.3d at 951. To the contrary, many people visit the arrest site despite full confidence in their U.S. citizenship. ER-43.

The arresting agent's opinion about Zullners (factor (3)) suffers from the same flaw. *Anyone* who visits the arrest area will be north of an illegal immigration route, yet many such visitors are in fact U.S. citizens. ER-43.

Furthermore, the barebones report here contained little additional information to mark the group out as border crossers—for example, no physical descriptions of uncleanliness or injuries and no suggestion that they were carrying foreign identity documents. *Compare Garcia-Villegas*, 575 F.3d at 951 (torn clothes and bloody hands); *United States v. Gonzalez-Corn*, 807 F.3d 989, 992 (9th Cir. 2015) (Mexican photo identification). As the magistrate judge remarked, "I do not have evidence about how he was dressed, what he looked like." ER-86.

Bottom line: The group's mere existence in the area does not tend to show alienage. And innocuous facts cannot satisfy corpus delicti

when they corroborate no essential element. *See Lopez-Alvarez*, 970 F.2d at 595 (holding that mere presence at the airport—the alleged crime scene—did not itself satisfy corpus delicti, as the defendant was sent to the airport as part of his legitimate job); *United States v. Fearn*, 589 F.2d 1316, 1323 (7th Cir. 1978) (reversing loan fraud conviction, despite witness testimony that defendant never complained about the damage for which he acquired the loan, because there was no reason to suppose that defendant would have complained to those witnesses).

Adding in the improper findings (factors (5) and (6)) does little to change the equation. The radio communication (factor (5)) has no corroborating value if one resists the temptation to read in hidden hearsay. *See supra*, Section II.A.i (describing the "hidden hearsay" problem).

As for the speculation that Mr. Vera-Rivas was running toward the border patrol agent (factor (6)), that goes only to *one* of the two types of corroboration set forth in *Lopez-Alvarez*. At most, it "tend[ed] to establish the trustworthiness of [Mr. Vera-Rivas's] admissions," inasmuch as it purportedly confirmed his account of the group's confusion. *Lopez-Alvarez*, 970 F.2d at 592. It did nothing to satisfy corpus delicti's other demand, that the prosecutor present "sufficient [corroborating] evidence to establish that the criminal conduct at the core of the offense has occurred." *Id.*; *see also United States v. Tanco-*

39

*Baez*, 942 F.3d 7, 24–25 (1st Cir. 2019) (holding that corroborating extraneous details from the defendant's statement does not help to corroborate admissions about criminal conduct); *United States v. Stephens*, 482 F.3d 669, 673 (4th Cir. 2007) (same). The magistrate judge herself made this point explicitly. "Ordinarily," she observed, "running towards a vehicle, even an unmarked vehicle, would not be corroboration of an illegal entry except in th[is] particular case where specifically it corroborates the statement of this defendant." ER-86.

That leaves only one piece of evidence to corroborate the actual criminal conduct: that Mr. Vera-Rivas's group was found crouched in bushes (factor (4)). But to satisfy corpus delicti, the corroborating evidence must be "probative of the key unconfirmed admission," bearing more than a "remote relationship [to] . . . the essential fact." *Tanco-Baez*, 942 F.3d at 25. And *generalized* suspicious behavior, like hiding, does not corroborate the *specific* fact at the core of the offense: alienage.

The evidence here is therefore analogous to the corroboration deemed insufficient in *United States v. Rodriguez-Soriano,* 931 F.3d 281, 288 (4th Cir. 2019). There, a defendant confessed to illegally straw purchasing a firearm. *Id*. at 288. The government tried to corroborate that statement by showing that the defendant had behaved suspiciously, telling inconsistent stories about the purchase. *Id*. at 290. But that generalized suspicious behavior was not enough. While that

40

conduct "may suggest that he lied to the ATF agents, [it] d[id] not establish that he knowingly made a false statement at the time of purchase." *Id.* at 290. Here, too, the group's evasive behavior—though perhaps suspicious in some generalized sense—is not itself probative of alienage. *Cf. United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008) ("We have previously held that no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity.").

On a final note, it bears remembering that corroboration matters in these cases. When it comes to unlawful border crossings, corroboration of alienage may seem like overkill—after all, who would lie about not being a United States citizen? But there are solid reasons for requiring the prosecutor to present "extrinsic evidence independently secured through skillful investigation." *Lopez-Alvarez*, 970 F.2d at 589 n.5.

For one, it is not uncommon for a person to be an unknowing U.S. citizen, as federal law provides at least five different, complex statutes under which a person may automatically become a citizen without knowing it. *See* 8 U.S.C. §§ 1401, 1403, 1409, 1431, and former 1432. And even if a person is aware of their citizenship status, they may have an incentive to deny it. In one analysis, 86% of the individuals who falsely stated they were "aliens" did so because they were threatened by

41

immigration officials or did not want to remain detained while their citizenship claims were being adjudicated. Jacqueline Stevens, *U.S. Government Unlawfully Detaining and Deporting U.S. Citizens As Aliens*, 18 Va. J. Soc. Pol'y & L. 606, 627–28 (2011). Indeed, in *Galindo-Gallegos*, a Border Patrol agent testified that "sometimes American citizens who face criminal charges falsely claim to be deportable aliens, because it is much better to be put on a bus to Mexico than sent to jail in the United States." 244 F.3d at 732. Mental illness also sometimes "le[ads] [arrestees] to initiate false claims of alienage." Stevens, *supra*, at 628. These kinds of incidents are not merely anecdotal—an estimated *20,000 citizens* have been wrongfully deported since 2003. *Id*. at 607

Applying this important doctrine here, the magistrate judge's corroborating facts did not satisfy corpus delicti, and Mr. Vera-Rivas's conviction must be reversed.

## III. The magistrate judge admitted improper opinion testimony about the Zullners area.

Finally, the magistrate judge never should have admitted one piece of corroborating evidence in the first place: the arresting agent's opinion that the Zullners area was "known to be a commonly used route of travel for illegal aliens to further their entry into the United States." ER-23. That statement was neither a proper lay opinion under Evidence Rule 701 nor a noticed, supported expert opinion under Evidence Rule 702.

42

As an initial matter, the agent's statement fails even Rule 701's standards for lay opinions, because the government did not establish that the agent's generalization about Zullners was "rationally based on the witness's perception." Fed. R. Evid. 701(a). The arresting agent provided only three facts about his professional background: (1) He had been a border patrol agent for about 10 years, ER-15; (2) he worked out of the El Cajon Border Patrol Station, ER-16; and (3) he was a canine handler, ER-16. None of these facts establish that he himself had personally perceived a high rate of unlawful immigration traffic in the Zullners area.

More importantly, the arresting agent's opinion should not have been allowed under Rule 701 to begin with. It should have been admitted—if at all—as an expert opinion under Rule 702. That's because Rule 701 expressly excludes opinions based on "specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). And Rule 702 encompasses opinions based on specialized "experience," like that accumulated while working as a border patrol agent. Fed. R. Evid. 702.

When it comes to law enforcement witnesses, there is an easy way to distinguish lay "perception[s]," Fed. R. Evid. 701(c), from expert "experience," Fed. R. Evid. 702. If the "officer's testimony [is] based on knowledge derived from the investigation of the case at hand," it is lay testimony. *United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1259

43

(10th Cir. 2020). But when it is "premised on the officer's professional experience as a whole," it is expert testimony. *Id.* Thus, for example, law-enforcement opinions about suspected drug traffickers' code words "are the subject of expert testimony, when based on the witness's experience in investigating narcotics offenses." *United States v. Reed*, 575 F.3d 900, 922 (9th Cir. 2009). But they are the subject of lay testimony, "when based on the witness's knowledge of the particular case and the defendants." *Id.*; *accord United States v. Williams*, 827 F.3d 1134, 1156–57 (D.C. Cir. 2016).

Here, the arresting agent's sweeping generalization about the Zullners area could not have been based on any single case, including "the particular case and the defendants" here. *Reed*, 575 F.3d at 922. Rather, the support for that opinion, if any, must have come from his "professional experience as a whole." *Cristerna-Gonzalez*, 962 F.3d at 1259. But the government laid no groundwork for the arresting agent to testify as an expert. It provided no expert notice, thereby "subvert[ing] the requirements of Federal Rule of Criminal Procedure 16(a)(1)(E)." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997).

Nor did the paltry background elicited at the start of the agent's testimony reliably support his opinion. ER-15–16. True, he testified that he had worked for border patrol for many years. ER-15. But to render an expert opinion about Zullners, he would need to show that his

44

testimony was "based on sufficient facts or data" about Zullners and was the "product of reliable principles and methods." Fed. R. Evid. 702(b)–(c). His years working for border patrol, generally, did not establish a reliable familiarity with immigration patterns in that location, specifically. *Contra* ER-7 (district court finding the opposite).

That is probably why, when defense counsel objected to this testimony, the prosecutor admitted, "Counsel is right." ER-23. By overruling the objection anyway, the magistrate judge erred. ER-23–24.

This error was not harmless. In light of the minimal corroborating evidence in this case, this evidence could have made the difference between accepting and rejecting Mr. Vera-Rivas's corpus delicti defense. *See supra*, Section II. Thus, the government cannot meet its burden to rebut the "presumption of prejudice," *United States v. Lague*, 971 F.3d 1032, 1041 (9th Cir. 2020), and at a minimum, this Court should vacate Mr. Vera-Rivas's conviction and remand for a new trial.

45

## CONCLUSION

For all of these reasons, this Court must reverse Mr. Vera-Rivas's conviction, or at least vacate and remand for a new trial.

Respectfully submitted,

DATED: December 5, 2023     *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas

46

## CERTIFICATE OF RELATED CASES

Undersigned counsel is unaware of any appeals related to this case pending before this Court.

Respectfully submitted,

DATED: December 5, 2023

*s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas

# CERTIFICATE OF COMPLIANCE

This brief contains 9704 words, excluding the items exempted by Fed. R. App. P. 32(f) and including words that appear in pictures. This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of 9th Cir. Rule 32-1.

Respectfully submitted,

DATED: December 5, 2023      *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas