**No. 23-374**
_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**MARTIN VERA-RIVAS,**

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Cathy A. Bencivengo, Presiding,
No. 19-CR-3622-JLB-CAB

———

**APPELLANT'S REPLY BRIEF**
_____

KATIE HURRELBRINK
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas

## TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................. 2

I. Only the hearsay labels let the government admit the freestanding photo, and only the freestanding photo let the government rely on Agent Wynglarz's corroborating observations. ................................................................. 2

    A. The government used inadmissible hearsay to lay the foundation for the freestanding photo .................... 3

        i. The government could lay the foundation under Rule 901(9) only by eliciting testimony about the name and event number. .............................................................. 3

        ii. The name and event number were inadmissible hearsay, as *May* confirms. .............. 5

        iii. The prosecutor could not have laid the foundation by comparing the clear picture with the black blob in the police report, because the police report was not admitted into evidence .......................................... 11

    B. The error was not harmless, given the hundreds of indistinguishable arrests that take place at the border each day. .......................................... 16

II. The government failed to corroborate Mr. Vera-Rivas's admissions of alienage under corpus delicti. ......................... 20

    A. There is an intra-circuit split on the standard of review. ........................................................ 21

i

B. The government does not try to defend the use of hidden hearsay, and its attempt to salvage the magistrate judge's speculative inference assumes a fact not in evidence. ...................................................21

C. The remaining factors do not adequately corroborate alienage....................................................24

III. Agent Wynglarz's generalized experience as a border patrol agent did not meet the other foundational requirements for lay or expert tesitmony. ...............................27

CONCLUSION ...........................................................................31

## TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*Atonio v. Wards Cove Packing Co.,*
  810 F.2d 1477 (9th Cir. 1987) (en banc) ............................................. 21

*Bayless v. United States,*
  381 F.2d 67 (9th Cir. 1967) .................................................................. 7

*Benitez-Mendez v. I.N.S.,*
  760 F.2d 907 (9th Cir. 1983) ............................................................... 23

*Huddleston v. United States,*
  485 U.S. 681 (1988) .............................................................................. 13

*Montana Green Party v. Jacobsen,*
  17 F.4th 919 (9th Cir. 2021) ................................................................ 17

*United States v. Brooks,*
  772 F.3d 1161 (9th Cir. 2014) ........................................................... 6, 8

*United States v. Campbell,*
  466 F.2d 529 (9th Cir. 1972) ................................................................. 7

*United States v. Corona-Garcia,*
  210 F.3d 973 (9th Cir. 2000) ............................................................... 25

*United States v. Galindo-Gallegos,*
  244 F.3d 728 (9th Cir. 2001) .......................................................... 18, 24

*United States v. Garcia-Villegas,*
  575 F.3d 949 (9th Cir. 2009) ............................................................... 25

*United States v. Gonzalez-Godinez,*
  89 F.4th 1205 (9th Cir. 2024) ........................................................ 21, 25

iii

*United States v. Juhic,*
954 F.3d 1084 (8th Cir. 2020)..............................................................10

*United States v. Katakis,*
800 F.3d 1017 (9th Cir. 2015)..............................................................22

*United States v. Lague,*
971 F.3d 1032 (9th Cir. 2020)........................................................20, 31

*United States v. Lizarraga-Tirado,*
789 F.3d 1107 (9th Cir. 2015)..............................................................10

*United States v. Lopez-Alvarez,*
970 F.2d 583 (9th Cir. 1992)....................................................23, 24, 26

*United States v. May,*
622 F.2d 1000 (9th Cir. 1980)....................................................... passim

*United States v. Munoz-Perez,*
2024 WL 291316 (S.D. Cal. Jan. 25, 2024) .........................................25

*United States v. Navarrette-Aguilar,*
813 F.3d 785 (9th Cir. 2015)................................................................22

*United States v. Niebla-Torres,*
847 F.3d 1049 (9th Cir. 2017)..............................................................21

*United States v. Oliver,*
987 F.3d 794 (8th Cir. 2021)................................................................10

*United States v. Ramirez-Martinez,*
273 F.3d 903 (9th Cir. 2001)................................................................18

*United States v. Rivera-Alonzo,*
584 F.3d 829 (9th Cir. 2009)................................................................23

*United States v. Rodriguez-Soriano,*
931 F.3d 281 (4th Cir. 2019)................................................................25

*United States v. Ruvalcaba-Garcia,*
    923 F.3d 1183 (9th Cir. 2019)....................................................29

*United States v. Siordia-Ibarra,*
    2024 WL 1672262 (9th Cir. 2024) .......................................25

*United States v. Snow,*
    517 F.2d 441 (9th Cir. 1975).....................................................7

*United States v. Tanco-Baez,*
    942 F.3d 7 (1st Cir. 2019) .......................................................25

*United States v. Valdez-Novoa,*
    780 F.3d 906 (9th Cir. 2015).................................................21

*United States v. Valencia-Lopez,*
    971 F.3d 891 (9th Cir. 2020)................................................30

| **Rules** | **Page(s)** |
|---|---|

Fed. R. Evid. 104 .................................................................... *passim*

Fed. R. Evid. 1101 ........................................................................15

Fed. R. Evid. 404 ..........................................................................13

Fed. R. Evid. 602 ..........................................................................19

Fed. R. Evid. 701 ..........................................................................28

Fed. R. Evid. 702 ..........................................................................29

Fed. R. Evid. 802 ..........................................................................19

Fed. R. Evid. 901 ....................................................... 3, 4, 5, 12

**Treatises**                                                                          **Page(s)**

Charles Alan Wright & Arthur R. Miller,
  *Exclusionary Rules in Rule 104 Determinations*, 21A Fed. Prac. &
  Proc. Evid. § 5055 (2d ed.) ................................................................. 15

## INTRODUCTION

The opening brief identified three major errors in Mr. Vera-Rivas's misdemeanor illegal entry trial. First, the prosecutor used two inadmissible hearsay statements—a name and an event number associated with a photo of Mr. Vera-Rivas—to establish that Agent Wynglarz arrested him. The prosecutor then used Agent Wynglarz's observations about that arrest as the sole evidence contesting Mr. Vera-Rivas's corpus delicti defense. Second, the circumstances of the arrest, which played out in a recreational area frequented by U.S. citizens, were in any case insufficient to corroborate Mr. Vera-Rivas's admissions of alienage. Third, the prosecutor did not provide adequate foundation for Agent Wynglarz to give a lay or expert opinion about smuggling patterns near the arrest area. Each error requires reversal.

The government contests each point. First, the government claims that the name and event number were not hearsay and, in any case, were unnecessary to admit the photo. The government also says that the prosecutor did not need the photograph to prove that Agent Wynglarz arrested Mr. Vera-Rivas, because each described the arrest similarly. Second, the government contends that corpus delicti was satisfied, because there is no proof that Mr. Vera-Rivas was engaging in recreation rather than committing a crime. Third, the government claims that Agent Wynglarz's border patrol experience, in

1

general, provided sufficient foundation for an opinion about Zullners, in particular. For the reasons below, each argument fails.

ARGUMENT

## I. Only the hearsay labels let the government admit the freestanding photo, and only the freestanding photo let the government rely on Agent Wynglarz's corroborating observations.

As explained in the opening brief, the government used inadmissible hearsay to establish that Mr. Vera-Rivas was among the people Agent Wynglarz arrested on May 15, 2019. AOB-19-28. At trial, Agent Wynglarz did not remember the arrest or Mr. Vera-Rivas. ER-17-20. He testified to the circumstances of the arrest based solely on his arrest report. ER-17-20. The arrest report identified the arrestees using photographs. But in his only copy of the report, the photos were too blurry to see. ER-28. He therefore printed out a clearer photo of Mr. Vera-Rivas, which another, non-testifying agent had taken. ER-38. The non-testifying agent had labeled the photo with Mr. Vera-Rivas's name and an "event number," a code indicating that the photographs were taken in connection with that particular arrest. ER-31-32, 35, 38. Only by conveying the name and event number was Agent Wynglarz able to prove to the magistrate judge that the clear photo depicted one of the people he arrested. ER-31-38. That allowed the prosecutor to authenticate the clear photo, establish the arrest testimony's relevance

2

to Mr. Vera-Rivas's case, and ultimately, rely on the Agent Wynglarz's observations to overcome corpus delicti. ER-40-41, 85-88. Those labels, however, were inadmissible hearsay. This Court must therefore reverse.

The government both denies that the prosecutor relied on hearsay to admit the clear photo and claims that the prosecutor did not need the clear photo to convict. Both contentions fail.

### A. The government used inadmissible hearsay to lay the foundation for the freestanding photo.

First, the name and event-number labels were inadmissible hearsay, without which the government could never have introduced the freestanding photo.

### i. The government could lay the foundation under Rule 901(9) only by eliciting testimony about the name and event number.

First off, the government suggests that Rule 901(9) defeats Mr. Vera-Rivas's admissibility challenge. That rule allows proponents to authenticate exhibits using "[e]vidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(9). The prosecutor properly invoked this subsection, says the government, by having Agent Wynglarz describe his process for obtaining the photo and explain why it reliably identified his arrestees. AAB-12-13, 18-19.

The government's premise is sound, but not its conclusion. Yes, the prosecutor could lay the necessary foundation using testimony

3

about Agent Wynglarz's process. But in so doing, the prosecutor still had to observe evidence rules; he was not allowed to establish his process's reliability using hearsay. *See infra*, Section I.A.iii (Rule 104(b) facts must be established with admissible evidence); Fed. R. Evid. 901, Notes of the Advisory Committee on Proposed Rules (authentication "is governed by the procedure set forth in Rule 104(b)"). That is intuitive. Surely, Agent Wynglarz could not have testified, "My process for obtaining this photo was to ask my colleague for photos of my May 15 arrestees. I know that that process reliably produced such photos because my colleague told me, 'These are the photos of your May 15 arrestees.'" That might satisfy Rule 901(9), but it would also be a clear violation of the hearsay rules.

Something analogous happened here, because Agent Wynglarz could describe his process and establish its reliability only by referring to the name and event number—both of which, as explained below, are inadmissible hearsay. From the beginning, Agent Wynglarz invoked the name and event number when describing his process: "I went into the processing system . . ., looked it up by the event that I had worked on May 15th and pulled up their names individually[.]" ER-28. Later, in the face of foundation objections, the magistrate judge asked Agent Wynglarz directly: "[H]ow do you know you're accessing the same photograph?" ER-31. He responded, "[Y]ou look up the event that was

4

created on the day that they were apprehended, and all their information is inputted along with their photo that is taken at that time." ER-31-32. Agent Wynglarz continued to testify along similar lines until the photo was admitted. *See, e.g.*, ER-35 (testifying to finding the photo using "an event number assigned to the group of subjects that w[as] apprehended").

The name and, especially, the event number were therefore crucial to the foundation. Accordingly, Rule 901(9) does not elide the hearsay issue but squarely implicates it.

### ii. The name and event number were inadmissible hearsay, as *May* confirms.

Next, the government argues that the name and event number were not hearsay. AAB-13-17. The government relies on one case: *United States v. May*, 622 F.2d 1000, 1007 (9th Cir. 1980). But in *May*, similar information was deemed non-hearsay because the prosecutor did "not 'offer[] [the information] in evidence to prove the truth of the matter asserted.'" *Id. May* clarified that if the prosecutor *had* offered the same statements for their truth, "such as to show that the defendants trespassed" into a certain area "or to show that the individual photographed gave a certain name," then the information *would be* hearsay. *Id.* That's what happened here. The government used the out-of-court statements to lay the foundation for the photos, and "[f]oundational evidence is valuable . . . only if it is true." *United States*

5

*v. Brooks*, 772 F.3d 1161, 1170 (9th Cir. 2014). Thus, *May* supports Mr. Vera-Rivas, not the government—especially as to the all-important event number.

Because the government relies so heavily on *May*, it bears reciting the facts in detail. The defendants in *May* were arrested after entering a military base. *Id.* at 1002. Each arrestee received a "bar letter" telling them not to come back. *Id.* And for each arrestee, officers also filled out Apprehension Data Cards, which were used "to aid in distribution and recording the receipt of the bar letters." *Id.* at 1006. These cards described each apprehension and included a photo. *Id.* The arrestees were later charged with illegally reentering the military base. *Id.* To convict, the government had to show that each defendant reentered after receiving a "bar letter." *Id.*

The government did so with "ample" ***live*** "testimony by the persons who made the photographs and the cards." *Id.* at 1007. These live witness testified "that the persons photographed were on the Base," "that each was served with a bar letter," and "that each was . . . photographed in either Tacoma or Seattle." *Id.* The government further provided "direct proof that, in the case of each defendant, the name on the card was obtained directly from the person whose picture was attached to the card." *Id.* at 1008. Naturally, "[n]one of this" live witness testimony "was hearsay." *Id.* at 1007.

6

In addition to the live witness testimony, however, the government also admitted the Apprehension Data Cards. But the cards "were not hearsay in th[at] case because they were not 'offered in evidence to prove the truth of the matter asserted.'" *Id.* at 1007. After all, there was little reason to do so, because live witnesses had already testified to all the information they contained. Instead of admitting them for the truth, the judge used only the "names" on the cards, and only "as circumstantial evidence" that persons with those names received bar letters. *Id.*

As the Court explained, this circumstantial use of names is common. If your name appears on a briefcase carrying a gun, that is circumstantial evidence that you knew of the gun's existence. *Id.* at 1008 (citing *United States v. Snow*, 517 F.2d 441 (9th Cir. 1975)). If your name appears on a receipt lying on the floor of a smuggling car, that is circumstantial evidence that you were involved in the smuggling. *Id.* (citing *United States v. Campbell*, 466 F.2d 529 (9th Cir. 1972)). If your name appears in prison records, that is circumstantial evidence that you were once incarcerated. *Id.* (citing *Bayless v. United States*, 381 F.2d 67 (9th Cir. 1967)). So too, the appearance of the defendants' names on the Apprehension Data Cards—cards used to catalogue bar notices—was circumstantial evidence that they indeed received bar notices. *Id.*

7

The Court in *May* took pains to point out that the nonhearsay use made the difference, warning that "the written contents of the Apprehension Data Cards could be hearsay if admitted for certain" other "purposes." *Id*. at 1007. For instance, they would be hearsay if offered "to show that the defendants trespassed on the Base." *Id*. The same conclusion would follow if they were admitted "to show that the individual photographed gave a certain name as the cards prepared that day stated." *Id*. The cards in *May* were admissible only because they did not establish the truth of these matters.

This case is distinguishable from *May* at every turn. First, here, there was no live "testimony by the person[] who made the photograph and the [labels]" and no "direct proof" of how the photographing agent "obtained" the "name attached" to the photo. *Id*. at 1007–08.

Second, the name and event number were not used as mere "circumstantial evidence," but were "offered . . . to prove the truth of the matter asserted." *Id*. at 1007 (simplified). That's because the government used the name and event number to lay the basic foundation for the freestanding photo. And "[f]oundational evidence is valuable . . . only if it is true." *Brooks*, 772 F.3d at 1170 (rejecting a claim in the Confrontation Clause context that foundational statements were not offered for their truth).

8

Take the event number. That number corresponded with a particular arrest that Agent Wynglarz executed around noon on May 15, 2019, on the side of Highway 94. ER-31-32, 35, 96. By tagging these photos with that same event number, the photographing agent asserted that these were pictures of the people involved in that particular arrest. AOB-20-21 (explaining that codes can convey assertions). To support the photos' admission, that assertion had to be true. If it were false—if these were *not* pictures of the people Agent Wynglarz arrested that day—then the foundation would fall apart. Likewise with the name. If this were *not* a picture of Martin Vera-Rivas, it would be out of place at Martin Vera-Rivas's trial.

Third, even if the hearsay carveout in *May* applied here, it would extend only to the name "Martin Vera-Rivas," as only "[t]he names on the cards" were admitted as "circumstantial evidence" of guilt. 622 F.2d at 1007. *May*'s logic would not apply to the event number. That matters, because ultimately, to lay the foundation for the photo, the government had to show that the photo depicted an arrestee described in Agent Wynglarz's arrest report. And at the end of the day, the name itself did not help much with that—merely showing that a border patrol database contained a photo labeled "Martin Vera-Rivas" does not establish that Agent Wynglarz carried out his arrest. What connected that photo to Agent Wynglarz's arrest was the event number. ER-31-32.

9

That's ultimately why the magistrate judge felt confident that this was the same photo: because Agent Wynglarz "search[ed] by event number," and the photo was among those "associated with this event." ER-32. *May* provides zero support for the proposition that the event number is nonhearsay. For all of these reasons, *May* does not aid the government.

On a final note, the government's attempts to distinguish *United States v. Lizarraga-Tirado*, 789 F.3d 1107 (9th Cir. 2015), and *United States v. Juhic,* 954 F.3d 1084 (8th Cir. 2020), are meritless, because they conflate an irrelevant holding about machine speech with a relevant holding about human speech. AAB-16-17. In *Lizarraga-Tirado*, this Court held that tacks generated by Google Maps are not hearsay, because they come from a machine rather than a person. 789 F.3d at 1109. But the Court further held that when humans add labels to those tacks, those human-generated labels are hearsay. *Id*. The Eighth Circuit later expressed disagreement with the Ninth Circuit about the machine-speech point, but agreement about the human-labels point. *United States v. Oliver*, 987 F.3d 794, 801 n.4 (8th Cir. 2021) (citing *Jurhic*).

Here, it is undisputed that the name and event labels were placed there by a person, not a machine. ER-35, 38. Therefore, *Lizarraga-Tirado* and *Jurhic*'s relevant holdings about human labels apply, and their divergence about machine speech is immaterial. Anyway, the

10

defense cited both cases solely to illustrate the codes and labels can convey assertions, AOB-20-21, and the government has not even tried to deny that.

Accordingly, the name and, especially, the all-important event number are hearsay.

### iii. The prosecutor could not have laid the foundation by comparing the clear picture with the black blob in the police report, because the police report was not admitted into evidence.

Finally, the government claims that the prosecutor could have admitted the freestanding photo by having the magistrate judge compare its shape with the shape of the black blob at the bottom of Agent Wynglarz's report. AAB-17-19. The government concedes that neither the report nor the black blob were admitted into evidence. AAB-4. But the government says that the magistrate judge nevertheless could have considered the black blob under Rule 104(a), which lets judges make certain admissibility decisions without adhering to evidence rules. Fed. R. Evid. 104(a).

That argument fails for two reasons. First, the prosecutor had to authenticate the photo and link it to this case under Rule 104(b), not Rule 104(a). And second, when deciding admissibility under Rule 104(b), courts may consider only admissible evidence.

*First*, Rule 104(b), not Rule 104(a), applied. That is most obvious when it comes to authentication, because the rules' commentary states the point directly: "Th[e] requirement of showing authenticity or identity fails in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)." Fed. R. Evid. 901, Notes of the Advisory Committee on Proposed Rules. Here, the government intended to authenticate the photo as a picture of the person whom Agent Wynglarz arrested. Thus, the government had to prove under Rule 104(b) that this photo, in fact, depicted one of the Agent Wynglarz's arrestees.

Rule 104(b) also applies more generally to the government's attempts to establish the photo's relevance to this prosecution by showing that it depicted one of Agent Wynglarz's arrestees. That's because Rule 104(b) comes into play any time "the relevancy of an item of evidence . . . depends upon the existence of a particular preliminary fact." Rule 104, Notes of the Advisory Committee on Proposed Rules.

For example, imagine that the prosecutor in a murder case wants to introduce a letter whose writer admits to killing the victim. That letter tends to establish the defendant's guilt *only if* the government can prove that the defendant wrote it.[1] Or imagine that a prosecutor in a

---

[1] This is taken from an example of conditional relevance in the commentary: "[I]f a letter purporting to be from Y is relied upon to establish an admission by him, it has no probative value unless Y wrote

12

gun-dealing case wants to admit a recorded phone conversation in which two parties agree to a sale. That recording would tend to show the defendant's guilt *only if* the government can prove that the defendant was one of the parties on the call.[2] Or imagine that a prosecutor wants to introduce prior acts evidence under Rule 404(b). That "evidence is relevant *only if* the jury can reasonably conclude that the [prior] act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (emphasis added). In each case, the government must prove that the murder defendant wrote the letter; that the gun-dealing defendant participated in the phone call; or that the defendant committed the prior act. And it must do so under Rule 104(b). *See* Rule 104, Notes of the Advisory Committee on Proposed Rules; *Huddleston*, 485 U.S. at 689.

Here, standing alone, a freestanding photo of Mr. Vera-Rivas does not tend to show that he was guilty; it does not—by itself and shorn of context—make it any more or less likely that he committed illegal entry. The photo became relevant only because Agent Wynglarz claimed

---

or authorized it." Rule 104, Notes of the Advisory Committee on Proposed Rules.

[2] This is inspired by another example of conditional relevance in the commentary: "[W]hen a spoken statement is relied upon to prove notice to X, it is without probative value unless X heard it." Rule 104, Notes of the Advisory Committee on Proposed Rules.

that it depicted one of the people he described in his arrest report. ER-26, 29. Because the freestanding photo was relevant *only if* it depicted the person whom Agent Wynglarz arrested, the government had to prove that fact under Rule 104(b).

The government reaches the contrary conclusion because it misunderstands what conditional relevance is. The government says that items are conditionally relevant only if "conditionally admitted subject to other evidence." AAB-18. But that is just one possible *procedure* for getting conditionally relevant evidence before the jury. *See* Fed. R. Evid. 104(b) ("The court may admit the proposed evidence on the condition that the proof be introduced later."). The *substantive definition* of conditional relevance is much broader, applying any time "the relevance of evidence depends on whether a fact exists." Fed. R. Evid. 104(b). That substantive definition, not the procedure, governs whether evidence is properly analyzed under Rule 104(b). Thus, whether approached from the authentication angle or the relevance angle, Rule 104(b) applies.

*Second*, Rule 104(b) facts must be established using admissible evidence. This is apparent from the rules' language. While Rule 104(a) lets judges make decisions without being "bound by evidence rules," Rule 104(b) does not include any similar exemption. Likewise, Rule 1101 contains a full list of "[e]xceptions" to the rules' applicability.

14

Fed. R. Evid. 1101(d). Rule 104(a) appears on that list. Fed. R. Evid. 1101(d)(1). Rule 104(b) does not. *See id.*

That difference in language gels with the rules' differing purposes. Rule 104(a) questions are entrusted to judges, who are free to review inadmissible evidence. But Rule 104(b) questions are "appropriate questions for juries." Rule 104, Notes of the Advisory Committee on Proposed Rules. That's the point of having two different rules: "If preliminary questions of conditional relevancy [under Rule 104(b)] were determined solely by the judge, as provided in [Rule 104(a)], the functioning of the jury as a trier of fact would be greatly restricted and in some cases virtually destroyed." *Id.* Juries, of course, can hear only admissible evidence. All these considerations have led commentators to conclude that "only admissible evidence can be used when the judge is deciding to submit the evidence to the [factfinder] under Rule 104(b)." Charles Alan Wright & Arthur R. Miller, *Exclusionary Rules in Rule 104 Determinations*, 21A Fed. Prac. & Proc. Evid. § 5055 (2d ed.). Any other rule would "make[] no sense." *Id.*[3]

All this brings us back around to the black blob in Agent Wynglarz's report. The government had to lay the foundation for

---

[3] Of course, in this bench trial, the magistrate judge played the role both of judge and "jury" (i.e., factfinder). But that cannot affect the meaning or operation of rules of evidence.

15

the freestanding photo under Rule 104(b), using admissible evidence. But Agent Wynglarz's report and the black blob were not admissible. Thus, the government could not use the black blob to lay the foundation for the freestanding photo.

### B. The error was not harmless, given the hundreds of indistinguishable arrests that take place at the border each day.

Finally, the government claims that none of this matters, because the interrogating agent identified Mr. Vera-Rivas. That, says the government, independently "tied [Mr.] Vera-Rivas to the illegal entry" with a courtroom ID. AAB-19.

As the government ultimately has to acknowledge, however, AAB-20, that logic fails to account for the central role of corpus delicti in Mr. Vera-Rivas's trial. To avoid a corpus delicti problem, the prosecutor had to rely entirely on Agent Wynglarz's *particular* observations surrounding the arrest—the crouching, the running, the arrest area's proximity to the border, etc. ER-85-88. Thus, it really matters whether Mr. Vera-Rivas was arrested by Agent Wynglarz or by someone else. And while the interrogating agent certainly identified Mr. Vera-Rivas as the man he interrogated, ER-48, that does not shed any light on whether he was also the man whom Agent Wynglarz arrested.

To try to draw that crucial connection, the government proposes to establish that details in Agent Wynglarz's arrest report match details

16

from Mr. Vera-Rivas's interrogation. But given the sheer number of daily arrests around the southern border, proving identity using a few arrest details is an unusually tall order. Judicially noticeable statistics tell the story. *See Montana Green Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir. 2021) (judicially noticing data on government websites). In the month Mr. Vera-Rivas was arrested, 12,039 inadmissible people were apprehended near the southwest border.[4] That included over 3,200 apprehensions in the San Diego sector alone, an average of over 105 per day.[5] Most people arrested in the San Diego sector that year were from Mexico.[6]

Thus, that the interrogation and arrest took place on the same day, and that the arrestees were also Mexican, does little to show that Agent Wynglarz was describing *this* arrest. *Contra* AAB-20. Nor does the fact that both Agent Wynglarz's arrestees and Mr. Vera-Rivas were taken to the Forest Gate Processing Center. ER-96, 100. The record

---

[4]         https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019#:~:text=In%20Fiscal%20Year%20(FY)%202019,entry%20on%20our%20Southwest%20Border

[5]     https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions-fy2019

[6]         https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf

17

contains no evidence that any other processing center was in use in the San Diego area at the time. So far as we know, all of the sector's arrestees were taken there.

The only other points of overlap add minimally to this profile. During his interrogation, Mr. Vera-Rivas said little about what happened during his arrest—just that the group contained five people[7] and that they eventually "ran to where the[] immigration truck was." ER-86. In contrast, Agent Wynglarz said only that the five arrestees were running east on a highway, not that they were running toward him. ER-24. The only overlap between these accounts, then, is that he saw a five-person group running—hardly distinguishing features for the many groups of people trying their best to evade border patrol. *See, e.g.*, *United States v. Galindo-Gallegos*, 244 F.3d 728, 729 (9th Cir. 2001) ("large group of people running"); *United States v. Ramirez-Martinez*, 273 F.3d 903, 907 (9th Cir. 2001) (same).

Finally, the government says that "both agents identified [Mr.] Vera-Rivas by name." AAB-20. That is technically true, inasmuch as Agent Wynglarz's report notes that one of the arrestees was "*later identified as Mr. Vera-Rivas.*" ER-26 (emphasis added). But it is clear from the report that Agent Wynglarz himself never asked the arrestees

---

[7] The government says five "men," AAB-20, but the group members' genders did not come up in the interrogation, ER-109.

18

for their names; some other agent (perhaps the photographing agent) must have conveyed the name to Agent Wynglarz. ER-26. And no one— neither the judges nor the prosecutors below—has ever tried to use that obvious hearsay as substantive evidence. If they had, the defense would have objected, and that objection would have been sustained. *See* Fed. R. Evid. 802 (hearsay is inadmissible); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Thus, the government can rely only on those few details—day of arrest, Mexican citizenship, number of arrestees, processing center, and running—to show Agent Wynglarz was describing Mr. Vera-Rivas's arrest, and not one of the dozens of other arrests carried out that day. And that generic profile would have to overcome *both* defense counsel's relevance/authentication objections *and* her identity-based arguments for acquittal. ER-76. If the prosecutor could not prove the connection by a preponderance, the report would be excluded under Rules 401 and 901, depriving the prosecutor of the corroboration needed to overcome corpus delicti. ER-76. But even if the evidence were admitted, defense counsel would have urged the magistrate judge acquit in her role as finder of fact. ER-76. She would have argued that there was at least a reasonable doubt about whether Mr. Vera-Rivas was among

19

Agent Wynglarz's arrestees, and thus, about the force of the government's corroborating evidence. ER-76. If the magistrate judge shared that reasonable doubt, then she would have to acquit.

"The burden to show that the evidentiary trial error was harmless falls on the government, and [this Court's] review begins with a presumption of prejudice." *United States v. Lague*, 971 F.3d 1032, 1041 (9th Cir. 2020) (simplified). Given the hundreds of other, similar arrests that daily occur in the San Diego area, those minimal connections do not overcome the presumption of prejudice. This Court must reverse.

## II. The government failed to corroborate Mr. Vera-Rivas's admissions of alienage under corpus delicti.

This Court must reverse for a second reason: Even with the details from Agent Wynglarz's report, the government failed to adequately corroborate Mr. Vera-Rivas's confession. Prosecutors usually have no trouble satisfying corpus delicti in immigration cases. AOB-35-38 (describing case law). But unique features of Mr. Vera-Rivas's case changed the calculus here. Mr. Vera-Rivas was found not in a remote wilderness, but in a recreational area that citizens frequent. ER-43. Agent Wynglarz could not remember the arrest, so his testimony included few corroborating details. ER-17-20. And the government provided no A-File documents to fill the gaps. In these unusual circumstances, the government did not satisfy the corpus delicti rule.

20

The magistrate judge's contrary conclusion was factually and legally erroneous.

**A. There is an intra-circuit split on the standard of review.**

Normally, this Court applies de novo review to corpus delicti arguments. *E.g.*, *United States v. Niebla-Torres*, 847 F.3d 1049, 1054 (9th Cir. 2017); *United States v. Valdez-Novoa*, 780 F.3d 906, 921 (9th Cir. 2015). But as the government notes, the Court has occasionally said that clear error review applies. *See United States v. Gonzalez-Godinez*, 89 F.4th 1205, 1208 (9th Cir. 2024). "A panel faced with such a conflict must call for en banc review," unless the standard of review makes no difference. *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1479, 1482 (9th Cir. 1987) (en banc).

**B. The government does not try to defend the use of hidden hearsay, and its attempt to salvage the magistrate judge's speculative inference assumes a fact not in evidence.**

As an initial matter, the opening brief noted two improper factors that the magistrate judge used to reject the corpus delicti defense.

First, the magistrate judge derived "hidden hearsay" evidence stemming from a radio communication to Agent Wynglarz. AOB-31-33. But this Court need not consider this issue further, because the government does not defend this factor on appeal. Instead, it concedes that the communication was never introduced for the truth and

21

reinterprets the magistrate judge's remarks to merely "explain why Agent Wynglarz was in a position to see [Mr.] Vera-Rivas." AAB-26-27. Thus, it is now uncontested that the radio communication does not corroborate alienage.

Second, based solely on Agent Wynglarz's testimony that the arrestees were "running the highway east," the magistrate judge inferred that the group was running *toward* Agent Wynglarz. ER-87. But Agent Wynglarz's report did not say which direction he was coming from, and thus, the report does not establish whether the group was running toward or away from him. AOB-33-34. So this purely speculative inference cannot corroborate Mr. Vera-Rivas's account of running toward border patrol. *See, e.g.*, *United States v. Navarrette-Aguilar*, 813 F.3d 785, 796 (9th Cir. 2015) (finding evidence insufficient after rejecting speculative inferences); *United States v. Katakis*, 800 F.3d 1017, 1025 (9th Cir. 2015) (same).

To defend the magistrate judge's logic, the government asserts that the group described in the report "would not [have] be[en] able to see that the vehicle was driven by a Border Patrol Agent until [Agent Wynglarz] exited." AAB-28. Thus, says the government, one can infer that the group would have no reason to run away. AAB-28.

But why wouldn't the group have been able to see that the car was driven by border patrol? Ordinarily, border patrol vehicles are marked

22

on multiple sides with the words "Border Patrol." Agent Wynglarz's report does not say that he drove an unmarked car. Thus, based solely on his report, it is just as plausible that the group saw a marked border patrol vehicle approaching and fled. *See, e.g., United States v. Rivera-Alonzo*, 584 F.3d 829, 831 (9th Cir. 2009) (describing noncitizens' flight from marked border patrol car); *Benitez-Mendez v. I.N.S.,* 760 F.2d 907, 908 (9th Cir. 1983) (same). The government's contrary assumption mere piles speculation on speculation.[8]

Even if this inference did contribute to the analysis, however, it would go only to one of the two corpus delicti prongs. Corpus delicti requires the government to establish both (1) "the trustworthiness of the admissions" and (2) "that the criminal conduct at the core of the offense has occurred." *United States v. Lopez-Alvarez*, 970 F.2d 583, 592–93 (9th Cir. 1992). As the magistrate judge remarked, the act of running toward the vehicle does not really "corroborat[e] . . . an illegal

---

[8] The government also tries to say that defense counsel agreed with the magistrate judge's baseless inference. AAB-28. Not so. When the magistrate judge first proposed her theory, defense counsel objected. ER-86. The magistrate judge rephrased to acknowledge that she was inferring, then asked, "Is that a more fair statement?" ER-87. Defense counsel responded with a polite but non-committal, "Sure." ER-87. She then immediately reiterated her objection that "the *toward* is an inference," and "where the agent is in relation to the people is all inference." ER-87. She never agreed that the inference was reasonable and, to the contrary, made clear that she believed it was not.

23

entry," but only "corroborates the statement of this defendant." ER-86; *see also* AOB 39-40 (collecting cases). Thus, the second prong would still require additional evidence specifically corroborating alienage— evidence which, as addressed next, does not appear here.

### C. The remaining factors do not adequately corroborate alienage.

With these matters resolved, only four factors remain to corroborate "the criminal conduct at the core of the offense." *Lopez-Alvarez*, 970 F.2d at 592. The first three all have to do with the arrest area, which was (1) close to the border, (2) far from a port of entry, and (3) north of a common smuggling route. ER-85-88. *But see infra*, Section III (contesting third favor). In the unusual circumstances of this case, however, these factors do not corroborate alienage. Arrest in a *remote* border area can be corroborating, because citizens have little reason to visit such areas. *E.g.*, *Galindo-Gallegos*, 244 F.3d at 730. But here, the arrest occurred in a "recreational area," populated with wineries, campsites, and ATV parks. ER-42-43. Citizens have every reason to visit. Innocuous factors that apply equally to the guilty and the innocent cannot overcome corpus delicti. AOB-39 (collecting cases).

That leaves only the fourth factor, that the group was crouching in the bushes when Agent Wynglarz first saw them. But to satisfy corpus delicti, the corroborating evidence must be "probative of the key unconfirmed admission," bearing more than a "remote relationship

24

[to] . . . the essential fact." *United States v. Tanco-Baez*, 942 F.3d 7, 25 (1st Cir. 2019). And *generalized* suspicious behavior, like hiding, does not corroborate the *specific* fact at the core of the offense: alienage. *See United States v. Rodriguez-Soriano,* 931 F.3d 281, 290 (4th Cir. 2019) (holding that lying to agents, though suspicious, did not corroborate illegal straw purchase). Thus, in the unusual circumstances of this case, the government's evidence did not corroborate alienage.

The government gives three responses, each of which lack merit. First, the government cites cases rejecting corpus delicti arguments in an immigration context. AAB-22-24. But the government's cited precedents only confirm the opening brief's appraisal of the case law. In each case, corpus delicti was satisfied because border patrol found the person in a "remote . . . area," *Gonzalez-Godinez*, 89 F.4th at 2010; *see also United States v. Munoz-Perez*, 2024 WL 291316, at *14 (S.D. Cal. Jan. 25, 2024) (same); *United States v. Siordia-Ibarra*, 2024 WL 1672262, at *2 (9th Cir. 2024) ("rural area"); an agent saw them climbing the border fence, *United States v. Garcia-Villegas*, 575 F.3d 949, 951 (9th Cir. 2009); or the prosecutor produced evidence of prior removals, *United States v. Corona-Garcia*, 210 F.3d 973, 979 (9th Cir. 2000). This Court has never found corpus delicti met without at least one of these alienage-corroborating features. AOB-35-38. None are present here.

Second, the government tries to corroborate guilt with the absence of evidence proving innocence. AAB-24. It does not matter that Mr. Vera-Rivas was found in a recreational area, says the government, because "there was no reason to believe that he was visiting a nearby winery" or that he was "camping." AAB-24. And it makes no difference that the prosecutor presented no A-file documents, because upon arrest, Mr. Vera-Rivas himself failed to produce "documents permitting him to be in the United States." AAB-24.

But those are not corroborating facts—they are burden-shifting arguments. They must therefore be rejected; it is the government's burden to corroborate his statement, not Mr. Vera-Rivas's burden to cast doubt on it. *See Lopez-Alvarez*, 970 F.2d at 589.

With the burden firmly in mind, these factors are not probative. On former point, the prosecutor presented no evidence tending to show that Mr. Vera-Rivas was *not* merely spending time with a group of friends, whether moving between wineries, hiking back to their campsite, or traveling to their ATVs. That is particularly true because, due to Agent Wynglarz's memory problems, we know nothing about what the arrestees looked like upon arrest—what they were wearing, what they were carrying, whether they were clean or dirty. As the magistrate judge said, "I do not have evidence about how he was dressed, what he looked like." ER-86.

26

As for the latter point, U.S. citizens do not regularly carry documents proving that they are allowed to be in the United States. Most leave passports and birth certificates at home. That Mr. Vera-Rivas produced no such documents therefore does not distinguish him from a citizen. Again, innocuous factors equally consistent with innocence do not corroborate crimes. AOB-39.

Third, the government emphasizes that Mr. Vera-Rivas admitted alienage both pre- and post-arrest. AAB-24-25. But as the government admits, multiple statements—even *Mirandized* statements—are insufficient by themselves to corroborate alienage. AAB-24-25. Thus, this Court must find that corpus delicti is not met and reverse.

## III. Agent Wynglarz's generalized experience as a border patrol agent did not meet the other foundational requirements for lay or expert tesitmony.

Finally, as explained in the opening brief, the Court never should have admitted Agent Wynglarz's lay opinion about the Zullners area. AOB-42-45. Agent Wynglarz provided only three, general facts about his background to lay the foundation for his opinion: (1) He had been a border patrol agent for about 10 years, ER-15; (2) he worked out of the El Cajon Border Patrol Station, ER-16; and (3) he was a canine handler, ER-16. But he testified to a specific conclusion, that Zullners "is known to be a commonly used route of travel for illegal aliens to further their entry into the United States." ER-23. There were two problems with

27

that opinion. First, because Agent Wynglarz's opinion was drawn from his experience as a whole, rather than his observations in this particular case, his opinion was unnoticed expert testimony. AOB-43-44. Second, because Agent Wynglarz did not at all explain how he came to believe that noncitizens commonly cross through Zullners, his testimony was inadmissible under both lay and expert standards. AOB-43, 45.

This second point—that the testimony is inadmissible even as lay opinion—is crucial, because while the government insists that this testimony is properly classified as lay opinion, the government does not explain how it could possibly satisfy Rule 701's foundational requirements. Under the rule, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . rationally based on the witness's perception." Fed. R. Evid. 701(a). Perception means "first-hand knowledge or observation." Rule 701, Notes of Advisory Committee on Proposed Rules. There is not a shred of evidence that Agent Wynglarz personally observed, on a firsthand basis, a high rate of unauthorized immigration in the Zullners area. He did not even testify to ever visiting the area before May 15, 2019, let alone personally observing multiple illegal crossings there.

In response, the government says that Agent Wynglarz's opinion satisfied Rule 701(a) because it was "based on his decade of *experience*

in the area as a Border Patrol agent." AAB-31 (emphasis added). But that's just the point. While expert testimony can be based on "experience," Fed. R. Evid. 702, including matters that the expert has "been made aware of" secondhand, Fed. R. Evid. 703, lay opinion cannot. It must be based on "firsthand knowledge." Rule 701(a) & Notes of Advisory Committee on Proposed Rules. Thus, to defend this as lay and not expert opinion, one must take experience (except for his firsthand, observational experience) out of the equation. But if one does that to Agent Wynglarz's testimony, there is no foundation left.

Hence why, as the opening brief noted, this was really unnoticed expert testimony. And contrary to the government's claims, AAB-35, the error in admitting that testimony was not harmless. True, this Court may still affirm when the record establishes all the requirements of Rule 702. *See United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019). But here, the record reflects only those three facts about Agent Wynglarz's experience. It contains no information about the "data" on which Agent Wynglarz's opinion is based, the "principles and methods" he used to derive that opinion, or whether those principles were "reliab[ly] appli[ed]." Fed. R. Evid. 702(b)-(d). Did Agent Wynglarz hear about Zullners's reputation from one colleague or 20? Was he aware of two crossings or 1,000? Was his knowledge anecdotal or statistical? Was it current or dated? We simply do not know.

That is dispositive, because while "qualifications and experience are relevant, and indeed necessary" under Rule 702, "they cannot establish the reliability and thus the admissibility of . . . expert testimony." *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020). In *Valencia-Lopez*, for example, an agent opined that the chances of a drug-trafficking organization coercing a drug courier was "almost nil." *Id*. at 895. To lay the foundation, he provided information about his "general qualifications," including "his law enforcement expertise [and] his experience with undercover work." *Id*. at 900. But "he failed to link his general expertise with his 'almost nil' conclusion," "never explaining *how* his expertise lent itself to that conclusion." *Id*. The government nevertheless claimed that this foundation was enough, because the agent's "opinions were based on his personal experiences and knowledge from his drug investigations." *Id*. at 901.

That argument was "well off the mark." *Id*. As the Court explained, "[t]he issue [was] not whether [the agent] had knowledge and experience sufficient to allow him to testify as an expert on the modus operandi of drug cartels. He did." *Id*. "Rather, the issue [was] whether he provided a reliable basis for his opinion that the likelihood of drug cartels using coerced couriers is '[a]lmost nil, almost none.'" *Id*. Because he failed to do so, his "general qualifications" did not suffice. *Id*. at 900.

The government's argument misses the mark for the same reasons. Thus, whether as lay or as expert testimony, this opinion never should have been admitted.

"The burden to show that [this] evidentiary trial error was harmless falls on the government, and [this Court's] review begins with a presumption of prejudice." *Lague*, 971 F.3d at 1041 (simplified). Given the government's already minimal corroboration under corpus deliciti, *see supra*, Section II, that presumption should carry the day, and this Court should reverse.

## CONCLUSION

For all these reasons, this Court should reverse Mr. Vera-Rivas's conviction or remand for a new trial.

Respectfully submitted,

DATED: September 16, 2024       *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas

31

## CERTIFICATE OF COMPLIANCE

This brief contains 6,908 words, excluding the items exempted by Fed. R. App. P. 32(f) and including words that appear in pictures. This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of 9th Cir. Rule 32-1.

Respectfully submitted,

DATED: September 16, 2024        *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Vera-Rivas